```
 1              IN THE UNITED STATES DISTRICT COURT.
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   STEVEN MACALUSO,                )  Docket No. 15 C 01739
                    Plaintiff,       )  Chicago, Illinois
 4                                   )  July 13, 2018
               v.                    )  10:05 a.m.
 5                                   )
     CITY OF CHICAGO, et al.,        )
 6                  Defendants.      )

 7
         TRANSCRIPT OF PROCEEDINGS - FINAL PRETRIAL CONFERENCE
 8           BEFORE THE HONORABLE VIRGINIA M. KENDALL

 9
     APPEARANCES:
10
     For the Plaintiff:        DVORAK LAW OFFICES LLC by
11                             MR. RICHARD J. DVORAK
                               6262 Kingery Highway, Suite 305
12                             Willowbrook, Illinois  60527

13                             DVORAK LAW OFFICES LLC by
                               MR. ADRIAN J. BLEIFUSS PRADOS
14                             MR. JOSHUA BATEMAN KUTNICK
                               900 West Jackson, Suite 5-West
15                             Chicago, Illinois  60607

16   For the Defendant         CITY OF CHICAGO - DEPT. OF LAW by
     City of Chicago:          MS. JESSICA GOMEZ-FEIE
17                             MR. JONATHAN CLARK GREEN
                               MS. KATHRYN E. KOHLS
18                             30 North LaSalle Street, Suite 900
                               Chicago, Illinois  60602
19
     For the Defendant         CITY OF CHICAGO - DEPT. OF LAW by
20   Officers:                 MR. SCOTT A. COHEN
                               MS. KELLY C. BAUER
21                             30 North LaSalle Street, Suite 900
                               Chicago, Illinois  60602
22
     Court Reporter:           GAYLE A. McGUIGAN, CSR, RMR, CRR
23                             Federal Official Court Reporter
                               219 South Dearborn, Room 2318-A
24                             Chicago, Illinois 60604
                               (312) 435-6047
25                             Gayle_McGuigan@ilnd.uscourts.gov
```

 1          (Proceedings heard in chambers:)

 2          THE COURT:  All right.  So let's go around the table

 3    and introduce yourselves, please.

 4          MR. COHEN:  Scott Cohen, C-O-H-E-N, for the individual

 5    defendants.

 6          MS. BAUER:  Kelly Bauer on behalf of the individual

 7    defendants.

 8          MR. BLEIFUSS:  Adrian Bleifuss, B-L-E-I-F-U-S-S, for

 9    the plaintiff.

10          MR. KUTNICK:  Joshua Kutnick, K-U-T-N-I-C-K, for the

11    plaintiff.

12          MR. DVORAK:  Richard Dvorak for the plaintiff.

13          MR. GREEN:  Jonathan Green on behalf of the City of

14    Chicago.

15          MS. GOMEZ-FEIE:  Jessica Gomez-Feie on behalf of the

16    City.  G-O-M-E-Z.  F-E-I-E.

17          MS. KOHLS:  Kathryn Kohls on behalf of the City.

18    K-O-H-L-S.

19          THE COURT:  Okay.  Great.  Good morning, everyone.

20          So what I'm actually going to start with, since I

21    inherited the matter, I've read everything, but it helps me to

22    just get a sense of where -- what came out of discovery and

23    whether the complaint has changed -- you know, whether the

24    evidence changed from the complaint.

25          So why don't I start with the plaintiffs, whoever

1    wants to begin there, and tell me the facts of the case and

2    what you had alleged and then what you think the discovery

3    shows.

4         It will help me make better rulings for you with the

5    motions *in limine*.

6         MR. DVORAK:  Sure.

7         So, yeah, it's sort of a case where a tort law

8    professor couldn't think of anything more messed up than this.

9         THE COURT:  So it would be a good law school exam,

10   right?

11        MR. DVORAK:  Horrible law school exam.

12     (Laughter.)

13        THE COURT:  One that the students would be talking

14   about for years, right?

15        MR. DVORAK:  Right.

16        So basically the gist of it is that he's arrested

17   pursuant to this domestic custodial situation with his wife.

18   He's in Will County courthouse.  He's, you know, acting *pro se*

19   on his case.

20        THE COURT:  What is he on -- what is he in there for?

21        MR. DVORAK:  No, no, he was just -- it was a divorce

22   court.

23        THE COURT:  A divorce -- okay.

24        MR. DVORAK:  I shouldn't say divorce.  It was child

25   custody.

1          THE COURT:  Got it.  Okay.

2          MR. DVORAK:  So he had been, you know, doing this for

3    years.  Okay?  I think it just recently closed.  It was an

4    ongoing thing with his ex-wife.

5          So, anyway, he's in court in Will County.  I think the

6    officers know, Oh, he's got court in Will County, that we'll,

7    you know, just arrest him there.  It was in relation to an

8    incident, you know, where he put certain things on the

9    internet.  And we can get more factually into it when it comes

10   to the motion *in limine*, but suffice it to say there was some

11   pretty colorful language used, et cetera, so --

12         THE COURT:  Against whom or regarding?

13         MR. DVORAK:  Against the ex-wife and her, I don't know

14   if it's her new husband or boyfriend, one of the two.

15         THE COURT:  Okay.

16         MR. DVORAK:  Anyway, we're trying to keep those facts

17   out, but I can always --

18         THE COURT:  Is that what he's arrested on?

19         MR. DVORAK:  Yes.  He was never charged.

20         THE COURT:  Is it some kind of assault or domestic --

21   what is the actual --

22         MR. DVORAK:  No.  They were investigating like

23   electronic harassment.

24         THE COURT:  Oh, electronic harassment.

25         MS. BAUER:  Cyber-stalking.

1          MR. DVORAK:  Cyber-stalking, electronic harassment,

2    yeah.  Anyway, so they pick him up on that, and he -- it had

3    been a few hours because the court lasted a while, and I think

4    the officers were kind of waiting for it to be done.  And when

5    it's done, they basically arrest him and cuff him, okay?

6          On the way to Chicago -- because they have to come

7    from Chicago, this is the first two arresting officers -- there

8    is a small -- obviously, the defense might dispute some of

9    these facts, but there's a small pit-stop for --

10          THE COURT:  I'll give you a chance, of course.

11          MR. DVORAK:  There's a small pit-stop in a parking

12    lot, I think.  I might be getting some of these facts wrong

13    myself -- I'm just kind of doing this off the top of my head --

14    and where he attempts to get his medicine because he's a

15    diabetic.  He has had a kidney transplant, so he needs

16    anti-rejection medication.  Stroke patient.  Heart condition.

17    I mean, every kind of conceivable thing you can imagine, he

18    has.

19          THE COURT:  So lots of personal medicines and such.

20          MR. DVORAK:  Yeah.  So, anyway, he gets -- he doesn't

21    get all of his medicine, but he does at least get his

22    injection, okay?  He -- but -- I mean he gets his medication

23    for the injection, not that he takes the injection right there.

24          THE COURT:  I get it.  Okay.

25          MR. DVORAK:  But he is allowed to bring that along

1    with him.  Turns out later that I don't think it actually had

2    the medicine in it, but anyway -- if I'm not mistaken.  I think

3    that's correct, right?  Yeah.

4           So, anyway, take him to Chicago.  Was it 51st and

5    Wentworth, I think?

6           MS. BAUER:  Yes.

7           THE COURT:  I know it too well.

8       (Laughter.)

9           MR. DVORAK:  I don't even know what area it is

10   anymore.  I can't keep up.

11          THE COURT:  Five, right?

12          MR. KUTNICK:  Central.

13          MR. BLEIFUSS:  It's the Second District, I believe.

14          MR. DVORAK:  Okay.  Well, anyway, Area Central I guess

15   it is now.

16          Anyway, then -- so along the way, obviously one of the

17   claims -- the first kind of claim that we're alleging is

18   excessive force slash failure to intervene for putting on the

19   cuffs too tight and not, you know, allowing him to release it a

20   little bit while he's, you know, complaining in the back seat

21   about all this.  So --

22          THE COURT:  In the transport from Will County to

23   Chicago.

24          MR. DVORAK:  Exactly, exactly.  So now -- that's

25   basically the first two officers.  Excessive force, failure to

1    intervene.  Those two officers are --

2             MR. BLEIFUSS:  Tracy and Munizzi.

3             MR. DVORAK:  -- Tracy and Munizzi.  That's right.

4             THE COURT:  I'm going to give myself some -- Tracy and

5    Munizzi.

6             MR. DVORAK:  Yeah.

7             THE COURT:  Okay.  Thank you.  All right.

8             MR. DVORAK:  And they essentially were just transport

9    officers.  I don't think they really knew about the case or

10   anything like that.

11            THE COURT:  Okay.  Got it.

12            MR. DVORAK:  So the next thing that's happening is

13   he's at the station.  I believe the plaintiff is going to be

14   saying that he basically told everyone that he needed his

15   medication, et cetera.

16            Did we have -- did we have deliberate indifference for

17   the medication against Tracy and Munizzi?  I believe we do,

18   correct?

19            THE COURT:  I can tell you.  I've got everything right

20   in front of me.  And I've been trying to --

21       (Counsel conferring.)

22            MR. DVORAK:  Against those two?

23            MS. BAUER:  Yeah, that was one of the discussions --

24            THE COURT:  Yes, so Tracy and Munizzi, Struck, and

25   Childs all have deliberate indifference --

1          MR. DVORAK:  Okay.  Then they are on there.  I wasn't

2     sure whether we had them on that or not.

3          MS. BAUER:  Pursuant to agreement, though, that was

4     changed to failure to provide medical care.  Remember the

5     discussion we had --

6          MR. COHEN:  But it's against those four, yes.

7          THE COURT:  Failure to provide medical care.  Got it.

8          MR. DVORAK:  We kind of had the wrong tort,

9     essentially, I think.  And I think we agreed with the city that

10    they had the correct constitutional tort, I guess --

11         THE COURT:  Okay.

12         MR. DVORAK:  Anyway, so -- yeah, so the basis of that

13    liability is essentially he's asking those two I need medicine,

14    I need medicine, take me to the hospital, and they do not.

15         Okay.  So their involvement is over.

16         Now he's at the station for quite a bit of time after

17    that, I mean -- just because I'm sure that, you know, this is

18    an investigation going on, the state's attorneys are probably

19    involved, et cetera, et cetera.

20         So several hours are going by.  And he's not cuffed at

21    this point anymore, so there's a period of time where he's not

22    cuffed, okay?

23         And through a series of events, basically the

24    plaintiff is saying he kept on asking for his medication,

25    et cetera, et cetera, and he was denied the medication.

1          He said he asked to go to the -- he asked for some

2     water and he was just given a little tiny cup.

3          He asked to go to the bathroom was denied that and had

4     to go in the cup and it overflowed.

5          I mean, there's, you know, a little bit more than just

6     the denial, but -- et cetera.

7          So eventually the officer -- the detective now --

8     we're at Struck and Childs, the two defendants in the case --

9     now they are sort of lead detectives in the case.  They do know

10    about the facts, et cetera.  We have a -- certainly a failure

11    to provide medical care against those two.  And, you know, they

12    do what they need to do to investigate.  They don't say, okay,

13    charges are dropped at that point or anything.  But well into

14    the early evening, I believe, is probably the time frame,

15    right?  Is when he's transported to the hospital?  6:00,

16    7:00 o'clock?  Does that sound right?

17         MR. BLEIFUSS:  (Nods affirmatively.)

18         MR. DVORAK:  Okay.  Now we're into the evening.  I

19    think he was probably arrested around 11:00 or 12:00 o'clock in

20    the morning.

21         So their involvement is essentially at the station,

22    and then they don't have an excessive force claim against those

23    two because they weren't in cuffs.

24         THE COURT:  Okay.

25         MR. DVORAK:  Now the torts continue because on the way

 1  to the hospital -- that's fine.  On the way to the hospital is

 2  fine.  We have two more officers who transport him there.  And,

 3  again, the same thing, cuffs are excessive -- by the way, I

 4  forgot to mention also he said I just recently had surgery,

 5  because he did have surgery.  And I'll get into that in a

 6  little bit.  So they -- our contention is they knew also about

 7  his recent surgery --

 8          THE COURT:  But what occurred that required the --

 9  that triggered the need to go to the hospital?

10          MR. DVORAK:  Well, no, the need to go to the hospital

11  was for the medication.

12          THE COURT:  Okay.

13          MR. DVORAK:  So he eventually was taken to the

14  hospital for medication.

15          THE COURT:  Okay.

16          MR. DVORAK:  We're saying that the delay in care

17  caused some damages.

18          THE COURT:  Okay.  Got it.

19          MR. DVORAK:  So on the way, now we have an excessive

20  force claim against those two officers.  They're the transport

21  officers to the first hospital.

22          THE COURT:  Which was what?

23          MR. DVORAK:  Those two names are?

24          MR. BLEIFUSS:  Alegre and Blourn.

25          MR. DVORAK:  Alegre and Blourn.

1    MR. BLEIFUSS:  And the first hospital was University

2    of Chicago, after an unsuccessful trip to another hospital.

3    MR. DVORAK:  Oh, yes, that's right.

4    THE COURT:  Unsuccessful trip to what?

5    MR. BLEIFUSS:  I think it was --

6    MR. COHEN:  Stroger?  Or -- not Stroger.

7    MS. BAUER:  In any event, they didn't have the

8    medication that he needed in stock, and so they took him to

9    University of Chicago.

10    THE COURT:  Got it.  Okay.

11    MR. DVORAK:  So that's -- so essentially now they go

12    to the hospital.  He gets his medication.  On the way back to

13    the hospital, they're at I think a stop sign or a stoplight,

14    one of the two.  Boom, the car gets hit from the back from this

15    other person, this just random person.

16    So our contention is -- I mean, obviously the person

17    who hit them has some responsibility involved.

18    THE COURT:  And he's not in the suit --

19    MR. DVORAK:  Well, actually, we did get a judgment

20    against her, but we're going to dismiss her from the case.  She

21    actually does have a default judgment, but we're going to

22    dismiss --

23    MR. COHEN:  I think she actually hit a car that hit

24    the police car.

25    MR. DVORAK:  Yes.  It was actually three cars.  Forgot

1    that little complication.

2            Now, our contention, though, is even though she may

3    have caused the accident -- and I'm sure the city is going to

4    put it all on her -- our contention is that they did not seat

5    belt him and had him in cuffs --

6            THE COURT:  Okay.

7            MR. DVORAK:  -- so that when what would otherwise have

8    been an uneventful car accident turned into him flying into

9    the --

10           THE COURT:  Front of the --

11           MR. DVORAK:  -- gate of the squad car, hits his head,

12   a wound occurs.  Now he has to go back to the hospital.

13           THE COURT:  Back to U of C.

14           MR. DVORAK:  Actually ended up being a different

15   hospital -- oh, was it back to U of C?  I'm sorry.  Okay.

16   Okay.  Yeah, once again, I -- sometimes the facts are

17   complicated to keep straight.

18           So now we're back to U of C.  Okay?  And he gets

19   treated I think -- I don't know -- I don't think it was

20   actually stitches, but it was some sort of gauze and, you know,

21   whatever.

22           MS. BAUER:  Ointment.

23           MR. DVORAK:  Some medication, ointment, that kind of

24   thing.

25           THE COURT:  Okay.

1    MR. DVORAK:  Of course then we get into Ms. Palsgraf,

2    about -- about -- well, Ms. Palsgraf I'm sure has been implied

3    a couple times already, but now what the contention is, our

4    contention is that there were certainly injuries from that, I

5    mean, hitting your head, et cetera.  But we're also contending,

6    and which the State -- City has a motion on is that eventually

7    this resulted in a, through a complicated series of events, him

8    getting impetigo, which is sort of like this infectious disease

9    that caused him all sorts of problems in the hospital.

10    THE COURT:  Anybody who has got a kid knows what

11    impetigo is.

12    MR. DVORAK:  So -- so, anyway -- so that's another

13    issue in the case.  I think that's a damages issue.

14    Okay.  So now that's over with.  Okay?  And --

15    THE COURT:  Impetigo actually comes from a strep

16    bacteria, I think.

17    MS. BAUER:  It's staph.

18    THE COURT:  Staph.

19    MS. BAUER:  It's where the staph is placed.

20    THE COURT:  Uh-hum.

21    MS. BAUER:  Yeah.

22    MR. DVORAK:  So --

23    THE COURT:  But does he get the impetigo in this

24    place?

25    MS. BAUER:  No, he does not.

1          THE COURT:  Ah-huh.  All right.

2          MR. COHEN:  There's also an excessive force claim

3     against Officer Campbell, who is one of the officers who takes

4     him back to U of C after the accident and allegedly again

5     handcuffs him too tightly.

6          MR. DVORAK:  Yeah, exactly.  I was about to get to

7     that, but yeah --

8          MR. COHEN:  Oh, sorry.

9          MR. DVORAK:  No problem.  I understand.  It may have

10    looked like I forgot that because I'm kind of all over the

11    place on this, but -- so, yeah, the -- yeah, on the way back,

12    that's the last officer -- that's the -- Campbell -- I

13    shouldn't say on the way back because he's released from the

14    hospital.  On the way to the hospital.  Correct?

15         MR. BLEIFUSS:  And at the hospital.  He's taken to

16    the --

17         MR. DVORAK:  Yes.

18         MR. BLEIFUSS:  -- hospital in the ambulance.  And he's

19    at the hospital under the supervision of Campbell.

20         MR. DVORAK:  Yes.

21         MR. BLEIFUSS:  And he's released from the hospital.

22         MR. DVORAK:  Okay.  So, essentially, for the most

23    part, he was in cuffs for, I don't know what period of time,

24    maybe two hours, hour or two, before essentially getting to the

25    police station; and then probably from the time that he goes

1    from the police station to the various hospitals, other than I

2    think a few changing of cuffs, et cetera, another five, six

3    hours.  I don't know the exact time period.  I think he's

4    released from the hospital around midnight, if I'm not

5    mistaken.

6         So now the only issue with the last officer versus the

7    other ones -- because I think the other ones are all going to

8    admit, yeah, that was me, but they're going to deny that it was

9    excessive, et cetera -- I think there's an identity issue with

10   the last one who I don't think is going to say defendant or not

11   defendant -- he's just going to say I don't remember doing that

12   at all --

13        THE COURT:  Meaning Campbell?

14        MR. DVORAK:  Campbell.  The way -- he was a little

15   more difficult to get.  We had to go through some event

16   queries, et cetera, kind of piece together things and figure

17   out, okay, it was one of these two officers.  And then I

18   believe the plaintiff, the way he described him, and

19   actually -- I think he actually did attend the deposition and

20   identified him and said it's Campbell, okay?  And that the

21   other officer I think stayed -- was not in the hospital and was

22   not the one who put cuffs.  So there's a slight identity issue

23   with the last officer.

24        And then as far as damages -- I think I got everything

25   factually.  As far as damages, we have a situation where --

1    okay, so before the incident, okay?  Mr. Macaluso fell in a

2    hole.  Okay?  And hurt his finger on his right -- right finger,

3    right index finger.  Okay?  This caused what's called trigger

4    finger.  Okay?  Sort of a, you know, a tightening of the

5    tendons or locking of the tendons or however else you describe

6    it.  And he did have to have surgery for that.  That was in

7    sort of the fall of 2014.  Dr. Leah Urbanosky was his hand

8    surgeon.

9              THE COURT:  When is the incident?

10             MR. DVORAK:  The incident was February of 2015.

11             THE COURT:  Okay.

12             MR. DVORAK:  4th, I think.

13             MR. BLEIFUSS:  (Nods affirmatively.)

14             MR. DVORAK:  February 4th.

15             THE COURT:  Okay.

16             MR. DVORAK:  And essentially he had been pretty well

17   healed, I don't think he was 100 percent, but pretty well

18   healed at the time of the February incident, but obviously he

19   was still sensitive, et cetera.  And that's why we're saying

20   once you're notified of that, you have to take extra

21   precaution, et cetera.

22             THE COURT:  But is he diabetic did you say?

23             MR. DVORAK:  He is diabetic --

24             THE COURT:  Okay, so --

25             MR. DVORAK:  -- which obviously causes all sorts of

1   other issues.

2        THE COURT:  All kinds of wound issues.  Right?

3        MR. DVORAK:  So, anyway --

4        THE COURT:  But he's healed from the finger.

5        MR. DVORAK:  I mean, he's not 100 percent.  He still

6   has pain and sensitivity.

7        THE COURT:  But there's no open wound.

8        MR. DVORAK:  No.  No.

9        THE COURT:  Okay.

10       MR. DVORAK:  Nothing obvious to the officers.

11       THE COURT:  Okay.

12       MR. DVORAK:  So, anyway, now we're at the time of the

13  incident.  It -- we're contending this is sort of an

14  aggravation of pre-existing condition, eggshell skull

15  plaintiff, now another tort question, you know, on that, so --

16       THE COURT:  How did they aggravate the trigger finger?

17       MR. DVORAK:  Well, they didn't aggravate the trigger

18  finger.  Okay?  Okay.  So I should explain what our theory is,

19  and then I'll get to the aggravation in a second.

20       So our theory is that he goes to the hospital.

21  There's a dispute about whether or not he was complaining of

22  pain, numbness.  I think they're going to call some ER people

23  who said, no, he did not complain of that; we're going to say

24  he can did complain of that.  I believe one of their officers

25  even admitted in the deposition he had complained of handcuff

1    pain.  And there's going to be dispute about that.  And then

2    the next day -- if it wasn't the next day, it would have been

3    the day after, he does go to I believe it was Dr. Uta, wasn't

4    it?  Was that the next day or the day after?

5              MR. BLEIFUSS:   (Nods affirmatively.)

6              MR. DVORAK:  And starts complaining about, you know,

7    tingling, numbness in the wrist, et cetera.  That starts a

8    series of treatments through various doctors.  And he ends up

9    back in front of Dr. Leah Urbanosky again, the same one who did

10   the prior surgery.

11             Now she's back to treating him again.  Now it's both

12   hands, it's not just the one hand.  But now it's the wrist, not

13   the finger.  And we just took her deposition recently.

14   Essentially what she said was that this resulted in carpal

15   tunnel in both wrists.  He had to have surgeries to both

16   wrists.  And she does say more likely than not they were caused

17   by the handcuffing.  Okay?  Which she actually indicated in her

18   medical records as well.  This wasn't a later on kind of

19   opinion.  She actually said that in her medical records.  And

20   we did not retain her as an expert.  She's a treating

21   physician, so -- although we did disclose her pursuant to

22   26(a)(c), whatever that -- whatever the recent rule is on that.

23             So -- so, obviously, we're saying that the -- both

24   surgeries are related to the incident as well.

25             THE COURT:  But she can't say that.  She can't say the

1   handcuffs are causing carpal tunnel unless you disclosed her as

2   a 702 expert.

3          MR. DVORAK:  We disclosed her under the proper

4   Rule 26(a) --

5          THE COURT:  Yeah, but you have a fact witness or you

6   have an expert witness.  So as an expert witness, if you're

7   going to use her expert conclusion, you have to disclose her

8   for an expert opinion.

9          MR. DVORAK:  We did.  We can show you the disclosure.

10  So -- I don't know necessarily if we used the Rule 702, but

11  we --

12         THE COURT:  Big difference, though.  Everybody

13  ruins -- they always do this wrong.  Huge difference.  You

14  know, you -- 702 has its whole parameters so that you say this

15  is her conclusion, so that they can then rebut it with another

16  expert.  Is that the land we're in or not?

17         MS. BAUER:  No, we dispute that.

18         THE COURT:  Okay.  All right.  So we'll deal with that

19  in a minute.

20         Okay, go ahead.

21         MR. DVORAK:  So, anyway, the -- and we just took her

22  videotaped deposition, and that's the conclusion that she came

23  to.

24         MS. BAUER:  For the second time, though.  This was her

25  second deposition.

1       MR. DVORAK:  Second deposition.  And she came to the

2   same conclusion in her first deposition as well, but ...

3       So -- and then obviously they hired an expert to

4   dispute that, and they're saying it's related to the diabetes

5   and it's an underlying condition.  And so we also have an issue

6   with regard to whether it was an aggravation of pre-existing

7   condition because I think both doctors will say that diabetes

8   makes someone susceptible to carpal tunnel.  And what our

9   argument is is that if that is true, then this would be an

10  aggravation of a pre-existing condition, if not an outright

11  causation, so ...

12      Do you know what I'm saying?

13      THE COURT:  I do.  I understand what you're saying.

14      MR. DVORAK:  I think that's pretty much our case.

15      THE COURT:  So the damages are the two surgeries?

16      MR. DVORAK:  Correct.

17      THE COURT:  And you're saying that the two surgeries

18  were proximately caused by the handcuffs.

19      MR. DVORAK:  Correct.

20      THE COURT:  And then whatever -- you're also claiming

21  damages to the injury to his head?

22      MR. DVORAK:  Yes.  Yes.

23      THE COURT:  And then you're also claiming damages of

24  pain and suffering for not having his medication.

25      MR. DVORAK:  Yeah.  So we did hire an expert,

1    Dr. Chugh, on that.

2           The main reason we hired him, other than the C. diff

3    part on that issue, is that the ER treaters themselves did not,

4    you know, say anything about the delay causing any kind of

5    damages, so --

6           THE COURT:  Well, what does he say?  What does your

7    client --

8           MR. DVORAK:  He has --

9           THE COURT:  But what does your client say happened

10   because he didn't have his medicine?

11          MR. DVORAK:  Increased heart rate.

12          MR. KUTNICK:  Blood pressure.

13          MR. DVORAK:  Increased blood pressure.  Not feeling

14   well.  And Dr. Chugh will sort of back that up --

15          THE COURT:  Well, he wasn't taking his blood pressure

16   or his heart rate, was he, unless he had an Apple watch or

17   something, right?

18          MR. DVORAK:  No, he was not taking --

19          THE COURT:  So he just felt like his heart was racing

20   and he felt like --

21          MR. DVORAK:  But Dr. Chugh will back that up with --

22   his vitals --

23          THE COURT:  Okay.  I'm just trying to figure out what

24   the evidence is to do damages for the delay in medication.

25          MR. COHEN:  I also asked him in the deposition, you

1    know, essentially you did get your medication in the end, so

2    what was the lasting damage after the --

3              THE COURT:  Yeah, that was --

4              MR. COHEN:  -- sort of emotional part is over.  And

5    he's -- and it's my memory is, well, nothing, I got the

6    medication.

7              MR. DVORAK:  It's a temporary damage.

8              THE COURT:  Okay.

9              MR. DVORAK:  We're not claiming any kind of permanent,

10   long-lasting damage.

11             THE COURT:  Okay.  Got it.  Okay.  So how he felt

12   without having the medication.

13             MR. DVORAK:  Exactly.

14             THE COURT:  Okay.

15             MR. DVORAK:  And then there's a unique part of that as

16   well in that he, because he had a kidney transplant, he's told

17   by his doctors you need this anti-rejection medication every

18   single day, if you don't take it you'll die, okay?

19             So to us -- we don't have any physical ramifications

20   from that, but we are --

21             THE COURT:  Just his --

22             MR. DVORAK:  -- claiming an emotional damage for,

23   like, Oh, my God, I might die because I'm not getting this

24   medication.

25             THE COURT:  Okay.  And how long was the period of time

1    between when he should have had the medicine and when he

2    finally received the medicine?

3            MR. DVORAK:  Well -- I don't know if you know the

4    exact times he's supposed to get it.  I believe he's supposed

5    to get it in the mornings, and he didn't get it until 7:00 or

6    8:00 o'clock at night.

7            THE COURT:  Okay.  And so the actual dollar amount of

8    damages from medical bills is what?

9            MR. DVORAK:  I believe -- well, you just did the

10    medical bills --

11            MR. BLEIFUSS:  70 or 80?

12            THE COURT:  70 grand?  Okay.

13            MS. KOHLS:  Does that include the C. diff?

14            MR. DVORAK:  I think the C. diff was $4,000.

15            THE COURT:  What is the C. diff?

16            MS. KOHLS:  He claims that from the car accident, you

17    know, he got the staph infection here, and then he got C. diff

18    three months after that, and so he claims it's all related to

19    the --

20            THE COURT:  What's C. diff?

21            MS. KOHLS:  It's --

22            MR. DVORAK:  Impetigo issue --

23            MS. BAUER:  C. diff -- it's not impetigo issue, it's

24    not staph.  It's a bacterial infection that results in

25    inflammation in the colon, and it can be a very serious

1    infection.

2          What happens is that he took antibiotics from the fact

3    that he got staph later on, and so that messes up with your gut

4    and the flora in your gut, and then he was more susceptible to

5    a bacterial infection.

6          THE COURT:  How are you spelling that?

7          MS. BAUER:  It's C dot Diff, D-I-F-F, dot.  That's the

8    shortened spelling.

9          MS. KOHLS:  And then the longer spelling is in -- I

10   think it's motion *in limine* Number 18.

11         THE COURT:  Okay.  I've got your back.

12         COURT REPORTER:  Thank you, Judge.

13         MS. KOHLS:  Apologize, your Honor.

14         THE COURT:  Okay.  Anything else from the plaintiffs

15   before I turn to the defense attorneys?

16         MR. COHEN:  There's also -- there are two claims

17   solely against the city.  I don't know if he mentioned that.

18         THE COURT:  He hasn't.

19         So your claims against the city are what?

20         MR. DVORAK:  The city as a party would be the -- well,

21   we have a battery claim.  Essentially, the difference between

22   the battery and the excessive force would be if for some --

23   well, I think, first of all, I think there's an intent element

24   to some battery.  Depends on how you want to define it, but

25   there may be an intent element to battery.

1        And, second of all, the main difference in our opinion

2    is with a battery, you don't necessarily have to find one

3    particular officer guilty, okay?  There's not an identity issue

4    that you do have with excessive force and failure to intervene.

5    So if for whatever reason the jury would say, you know, I'm

6    really not sure who did what, I just know that, you know, one

7    or more of the officers did, then they can do the battery

8    claim.  So it's more of an identity issue.

9            THE COURT:  And what's the second count against the

10    city?

11            MR. DVORAK:  The second count is -- well, that's

12    another dispute about whether it's a negligence count or a

13    willful and wanton count.

14            THE COURT:  So do you have punitive damages alleged?

15            MR. DVORAK:  We did not -- we dropped our punitive

16    damages.

17            THE COURT:  Okay.

18            MR. DVORAK:  The difference is -- we cited a case that

19    said if you're not enforcing the law, then it's negligence.

20    And so, for example, in these car cases, they're saying you're

21    not enforcing the law if you're just driving around.  I was

22    unable to find a seat belt case in particular -- and I don't

23    know if the city has either.  I don't think they did.

24            So we're claiming it's a negligence standard; they're

25    saying it's just the traditional willful and wanton standard.

1          THE COURT:  Okay.

2          MR. GREEN:  Absolute immunity.

3          THE COURT:  Okay.  So let's start with the easier

4     party.

5          How about the city?  Your position on all of this?

6          MR. GREEN:  Well, your Honor, first of all, we have

7     two motions *in limine* on each of the claims.

8          THE COURT:  Okay.

9          MR. GREEN:  The battery claim we say is entirely

10    duplicative, and we argued the case law that the federal court

11    does not have to really rule on that because basically they've

12    identified everybody they said who actually cuffed the person.

13    Otherwise, it's purely speculative.  There was no further

14    identification in any of the discovery --

15         THE COURT:  And there's no dispute about whether

16    someone was acting under the color of law.

17         MR. GREEN:  Exactly.

18         THE COURT:  Which is generally the distinction.

19         MR. GREEN:  Right.  And that's where it becomes a

20    little more complicated.

21         With battery, we have to have willful and wanton.  We

22    have to modify the jury instructions, as we did, and then -- we

23    can go to that if we have to.

24         Then the other one is kind of the elephant in the room

25    because that's where they're claiming a lot of extra damages

1    that went on and on with the C. diff and other things.  And

2    that's the totally unrelated injury that occurred at the car

3    accident.  Has nothing to do with the Section 1983 claims.  So

4    there's a question of whether, you know, supplemental

5    jurisdiction should be exercised as such.  I just put that out

6    there.

7            But essentially you have, admittedly, a car accident

8    that was caused by a third party, and they admitted it in their

9    own pleadings and even got a default judgment against her.

10           The act -- the only act really that's even related to

11   the city is when the officers were securing a felony arrestee

12   in a cage car, in a detention facility, essentially a mobile

13   detention facility.  That's not something that anybody does.

14   You know, they have to make sure he's secured for the safety --

15   that's why we have the absolute immunity defense, it's in our

16   motion *in limine* -- about it's police service.  Other people

17   don't do that.

18           The cases that they claim are the transport -- there's

19   two cases.  One is like an Evanston officer.  They were just

20   driving like anybody else does from point A to point B.  Had

21   nothing else to do with police service.  And they caused the

22   accident.  It wasn't even a third party.

23           The other one, *Betts*, was a police officer was pulling

24   out of a parking space and backed into a car.  Again, it's just

25   like anybody else.  Had nothing to do with police service,

1    unlike this case where you're dealing with possibly dangerous

2    felony arrestee, they have to secure in a cage car.

3            Then the way they pleaded is they say, well, they

4    didn't enforce the seat belt law.  Well, that in itself is

5    enforcing the law.

6            So we have first a number of absolute immunity we can

7    go through in the motion *in limine*.  And then the second one is

8    if they are claiming it's a failure to exercise -- or enforce

9    the seat belt law, then it's enforcing the seat belt law and it

10   should at least be willful and wanton.

11           And, by the way, the two cases that they cite for the

12   transport, really the only thing pled in those cases was the

13   2-202, which was the willful and wanton exception, enforcing

14   the law.  So the court was forced to just analyze it that way,

15   and they said the evidence didn't cover that particular

16   instance, especially driving from point A to point B.

17           THE COURT:  So did you move for summary judgment?

18           MR. GREEN:  No.  Unfortunately, it was very unclear.

19   The city came in as a *Monell* claim.  We got rid of the *Monell*

20   claim.  Then they put in an ADA claim.  And we just recently

21   got rid of that claim.  And then when we were coming to

22   trial --

23           THE COURT:  On summary judgment?

24           MR. GREEN:  No, they dropped it.

25           THE COURT:  Oh, I see.  So has there been a summary

1     judgment briefing on this case?

2            MR. GREEN:  No, we were --

3            MS. BAUER:  No.

4            MR. GREEN:  We were starting to brief an ADA, and then

5     we decided, no, just go forward.  Then the actual negligence

6     slash willful and wanton claim was very -- actually, it's not

7     proper under Illinois law.  There wasn't a separate claim for

8     each.  It was kind of mixed.  And we -- they were going forward

9     with the willful and wanton.  And then, you know, last night

10    when we were putting the pretrial order together, they pulled

11    the willful and wanton and said it should be pure negligence.

12    So we're still trying to clarify exactly what the claim was.

13    But apparently now they're claiming it's pure negligence.  We

14    say there's absolute immunity --

15           THE COURT:  This is a 2015 case.  My goodness.  We do

16    it a little differently in this courtroom.  But we'll get it

17    taken care of.

18           All right.  Anything else you want to add with the

19    city?

20           MR. GREEN:  I don't think so.

21           My colleagues?

22           MS. GOMEZ-FEIE:  No.

23           THE COURT:  Anything?

24           Okay.  How about the individual officers now?

25           MR. COHEN:  No, I think --

1          THE COURT:  Okay.

2          MR. COHEN:  Do you have anything else?

3          THE COURT:  I'm thinking maybe I'll do this even

4     though it's my case sometimes in the future because, you know,

5     the evidence sometimes changes over the course of discovery,

6     and I always jump into final pretrial conferences and I never

7     ask what did discovery show before we start ruling on these, so

8     it was a little helpful primer.

9          Okay.  Let's go through then -- we'll start with trial

10    procedure to give you an understanding of what you're going to

11    be doing in my courtroom.  And then we'll start with your

12    motions *in limine* and we'll go to jury instructions.

13         The only thing I will do on witnesses and evidence is

14    in categories, if there are certain, you know, groups of

15    documents that one side or the other believes should be

16    excluded, we'll address those.  Otherwise, the typical, you

17    know, evidentiary challenge will be just a regular objection

18    unless it's something that we need to exclude, like medical

19    records of this or that.  And if it's not covered in your

20    motions *in limine*, we'll just go forward at the trial with

21    that.

22         So let's start with the procedures.

23         You're going to have a trial day between 9:15 and 5:00

24    every day.  I've scheduled you for five days?  Is that correct?

25    Is everyone onboard for five trial days?

1          MR. DVORAK:  I think we actually had six.

2          THE COURT:  Do you have six trial days --

3          MR. DVORAK:  I don't think it's going to take six,

4     though.

5          THE COURT:  All right.

6          MR. COHEN:  We have seven defendants.

7          THE COURT:  Yes.  That's a lot of defendants.

8          MR. COHEN:  At least -- at least three treaters that

9     will be just done with deposition transcripts --

10          THE COURT:  Did I schedule more than the week?

11          LAW CLERK:  We just have it for five days.

12          THE COURT:  For the five days.  Okay.

13          MR. COHEN:  No, that's correct.  I'm just -- I'm

14     wondering if we're going to get it done in five days.

15          THE COURT:  Okay.  I'm going to take a look at my

16     trial calendar then.

17          But it's a full day, and it moves.

18          Have any of you had a trial in front of me before?  I

19     don't think --

20          MR. COHEN:  I have, years ago.

21          THE COURT:  You did, right?

22          MR. COHEN:  Yes.

23          THE COURT:  Okay.  So let's go through the procedures

24     so you'll know.

25          You're going to get a solid five and a half to six

1    hours of courtroom time in, so, you know, that's a lot compared

2    to other courts here, so you need to be prepared with your

3    witnesses because what I don't want is for someone to say to me

4    at 4:00 o'clock, "We ran out of witnesses."  We're going to

5    give you the time so that we can move you and get your job

6    done.  Jurors are happier when they're working and when they're

7    getting the job done.

8            So you'll start every morning at 9:15 in my courtroom.

9    That means that you're on the call between the civil call and

10   the criminal call, which starts at 9:30.  And the purpose of

11   that is for you to raise with me any issues that may impact our

12   day.  "Last night, Judge, we were interviewing someone and this

13   issue came up and we have a problem with it."  Right?  That way

14   if the jury comes in to start its day at 9:30 and I realize I

15   need to spend some time with you, I can tell them to go to the

16   cafeteria, take their time.  A happy jury brings in verdicts,

17   okay?  And we respect their time more.  So you come in at 9:15

18   every morning and tell me what those issues are.  If you do not

19   have issues, then you call Lynn and you say we have nothing to

20   address the Court with, we will be here at the time the trial

21   begins.  But if you don't do that, you're on the call.  All

22   right?

23           Now, during the course of the trial, you are required

24   to raise with me at lunch and at the breaks any time you need

25   to address an issue for the next witness so that way, the jury,

1   when they come out, is not interrupted with a sidebar or

2   something else, so be a little bit more proactive in your

3   approach, okay?

4          Procedure for the trial.  Stand for all objections.

5   That's -- there's a lot of people in that room, so we're going

6   to need to make sure we know who is making the objection, and

7   you will have a better transcript from Gayle when she can see

8   who it is aside from just hearing who it is.  Okay?  It also

9   triggers to the witness to stop talking, right?  So stand for

10  all objections.

11         There's no speaking objections such as arguing your

12  case.  You say the evidentiary rule.  And if I ask for a few

13  more pieces of information, you can provide that.  But it

14  should be something like "This is hearsay" or "This goes to our

15  pretrial ruling" or something like that.

16         If we need a sidebar, you can ask for it, but I try

17  really hard to limit the sidebars because that -- it just takes

18  time and it frustrates jurors, okay?  That's what all of the

19  other breaks are for.

20         Each day you'll have one hour at lunchtime, usually

21  12:30 to 1:30.  You'll have 15 minutes in the morning, usually

22  around 10:45, and at 3:30, 15 minutes in the afternoon.  So

23  schedule your witnesses in that kind of ballpark range.  Okay?

24  And make sure that they are ready and able to come.

25         I will get another witness room for you.  I'll check

1    with Judge Dow and Judge Gottschall to see if they have trials

2    going.  If they don't, I'll open up one of those.  And I have

3    the litigation -- the federal trial bar attorney lounge

4    kitty-corner from me that I've decorated nicely for you.  It

5    has wi-fi, chargers, and water and coffee.  So you all can go

6    in there, and it's a good place, and you're very lucky to be on

7    the same floor as it, so feel free to have your witnesses wait

8    there as well, which is really a nice place.  So make sure your

9    witnesses are ready to go.  And if you have witness problems,

10   you should raise them with me the night before.  Talk with each

11   other.  It is the courtesy of lawyers to provide the witnesses

12   you will be calling the next day the night before in the order

13   you're going to be calling them or with any other kind of

14   issues regarding, well, we might have to call this one first or

15   second.  That's just the courtesy of trial lawyers.  I was a

16   trial lawyer.  Tried 50 cases.  That's the way we do it in this

17   building, okay?

18          MS. GOMEZ-FEIE:  Judge, on a personal level, I'm

19   pumping --

20          THE COURT:  Oh, good.  So we have a space for you.

21          MS. GOMEZ-FEIE:  Okay.

22          THE COURT:  What I can do is -- let me find out if I

23   can give you -- I don't think Judge Gottschall is going to be

24   on trial because this is her trial.  I can give you her jury

25   room.  So there's a refrigerator in there.

1          MS. GOMEZ-FEIE:  Even better.

2          THE COURT:  Even better.  And so what I'll do is I'll

3    notify her staff and make sure that we have it all set up for

4    you.

5          MS. GOMEZ-FEIE:  Thank you so much.

6          THE COURT:  Okay?  There is a place on the second

7    floor with the nurse's office.  But if she'll give us the jury

8    room -- the last trial I had two women who were pumping, so we

9    had two rooms that we worked with.  So we are all about making

10   sure everybody is comfortable, and we'll make that happen for

11   you.

12         MS. GOMEZ-FEIE:  Thank you so much.

13         THE COURT:  Okay?  Okay.  So what else do I need to

14   address as far as procedure?

15         Oh, you can use the whole courtroom, just don't go in

16   the jury box.  If you want to move things when you are, you

17   know, presenting, it's your courtroom.  You go ahead and turn

18   it.  Just ask for some help.  They're heavy as sin.  You need

19   to, you know, really move them.

20         Please use the electronic equipment in the courtroom.

21   These binders are old-school.  People have a hard time seeing

22   your printouts.  They have a hard time balancing these on their

23   laps.  Use the electronic equipment if you have documents.  And

24   I am the person who controls the toggle.  If you've used the

25   equipment in other people's courtroom -- you have to actually

1    make the motion, "Judge, we're moving this Government or

2    Prosecution," whatever -- I'm going criminal, sorry --

3    "Plaintiff moves Exhibit 31A into evidence," and then I will

4    look to the other side to see if there's an objection.  I'm the

5    one who publishes.  Okay?

6             So the question is then if you have no dispute about

7    an exhibit and you know the other side doesn't, all you have to

8    say then is "I'm showing you agreed exhibit, Plaintiff's agreed

9    exhibit," and I'll immediately press the button and display it,

10   because if there's no dispute regarding it, there's no reason

11   to go through the formality.  And you should have a number of

12   those that you're all agreeing upon, okay?

13            As far as arguments in -- in closing argument, you

14   have your space.

15            As far as opening statements, exhibits.  I don't mind

16   using exhibits in opening statements if the other side doesn't

17   object.  So if there's a big objection about it, it has to be

18   raised with me beforehand.  And most likely it will mean that

19   you won't be able to use it if you're going to object to its

20   use, because the purpose of the exhibit in opening statement is

21   to help the jury to understand what the case will show.  And if

22   there's going to be some dispute about what the case will show,

23   then we'll wait until it plays out in the courtroom.  But, you

24   know, sometimes people have pictures of the vehicle or

25   something else, and there's no problem with it.  So you can

1    show exhibits in the opening.

2              You can use -- and I encourage you to use -- the jury

3    instructions in your closing argument.  You will have them at

4    the time.  And I do not mind using jury instructions even in

5    opening statement if we have hammered that jury instruction out

6    and I've said this is fine.  If we're hammering it out still,

7    you won't be able to do that, okay?

8              Now, jury instructions are an evolving process.  We're

9    going to work on them today.  And then what I'm going to do is

10   I'm going to take them under my wing and turn them a little bit

11   around and then give them back to you by email, and it's your

12   obligation to continually look at those emails throughout the

13   course of the trial.

14             So, for example, I'll work on them now and send you

15   something.  And then when you get them, don't wait until the

16   last minute.  See if there's an objection or tweak something

17   and we'll raise it each night, because by the time the trial

18   ends we want to be able to have that final set of jury

19   instructions, okay?  We don't want you waiting until the end.

20             The jury instructions also can be supplemented and

21   they can be changed depending upon the flow of the evidence.

22   Right?  So some of the things that we might discuss today will

23   be taken under advisement to see how it plays out in the

24   courtroom.  Okay?

25             If you do have hard exhibits, please give a copy to

1    me, give a copy to my court reporter so your record is nice,

2    and one more copy for a law clerk or intern who might be

3    interested in following along.  I've got kids here who are

4    working for nothing, and so it's nice for them to be able to

5    learn a little bit by following along.  So if you do have hard

6    copies, that's what we'll do.

7             Is there going to be any audio or video evidence?

8             MR. COHEN:  At least two depositions were videotaped

9    and will be used.

10            THE COURT:  Okay.  So please know how to use the

11   equipment.  Make an appointment with the appropriate person.

12   My website has it on there for the trial procedures.  Make the

13   appointment, come in.  I'm not going to be the person to fix it

14   for you like if it doesn't work.  That's -- I'll call if my

15   equipment breaks down; but if it's user failure, that's on you.

16   So make sure you know how to do it.

17            MR. DVORAK:  Who would we call, Judge?

18            THE COURT:  His name is -- it's on the website.

19            LAW CLERK:  I have copies of this from the website.

20            THE COURT:  Yeah, why don't you give them a set.

21            LAW CLERK:  I'll hand you this.  There's a link on the

22   website, but there's a hard copy.

23            THE COURT:  So I have civil trial procedures on the

24   website for you that goes through a number of these things.

25         (Tendered.)

1          THE COURT:  Let me think of what else I want to

2  mention.

3          MR. DVORAK:  We do have one audio, by the way, Judge.

4  Don't we have a -- actually a police communications.

5          (Counsel conferring.)

6          THE COURT:  So there's no arguments in front of the

7  jury about evidence -- discovery is what I mean, about

8  discovery.  You know, "I didn't see this, I didn't get that,"

9  that's -- that is absolutely a sidebar.  That's prejudicial to

10  the jury.  And we'll talk about all of your motions *in limine*

11  now and see if we can give you some rulings and hammer out --

12  get you ready for trial, okay?

13          MR. COHEN:  Judge, with respect to those depositions,

14  we need to come up with, you know, the designations and

15  objections, so I guess we'll just get that to you sooner rather

16  than later --

17          THE COURT:  You have to give it to me sooner.  I can't

18  work -- those take time.  So if you're objecting to things, the

19  best way to provide it to me is in like some kind of red-lined

20  format where you've got your comment, you know, objection for

21  whatever reason in a red-line note.  If you can do it that way,

22  I find it the easiest way to do it.  I'm all electronic here,

23  so if you can do it that way, it's helpful.

24          MR. DVORAK:  In Word format?

25          THE COURT:  Yes, in Word format.

1      MR. DVORAK:  We stopped doing Word Perfect a long time

2  ago, right?

3      THE COURT:  Yeah, we did.  But, boy, I was a

4  government girl back -- well, I've been a government girl my

5  whole life -- but back at the U.S. Attorney's Office, we did

6  Word Perfect, and it was just difficult to get everything done.

7  We're on Word now.

8      MR. DVORAK:  Okay.

9      THE COURT:  And when you -- you're going to be

10  required to submit your jury instructions to me in electronic

11  form in Word, and I'll have it going to -- this is my law

12  clerk, Whitney -- I don't know what I'm calling you today, am

13  I -- Adams --

14      LAW CLERK:  You can go with Adams --

15      THE COURT:  Okay.  Whitney Adams.  And Whitney is

16  going to be the recipient of -- she's just going to be the

17  person who is receiving and sending out things to you.  Every

18  time you send something to Whitney, you must CC me.  So you

19  cannot just send something to the law clerk.  Okay?  So I'm

20  always on it, and I'm always the person who is receiving it.

21  Or you can CC her.  She's really the person who is going to be

22  working with me on getting them in cleaned-up form for the

23  jury.

24      MR. COHEN:  Judge, what we've -- what I've done one

25  time in the past is we have like the plaintiff's -- what they

 1    want from the dep in one color, and then the other, you know,

 2    the defendants have another color --

 3              THE COURT:  I like that.  Yes, that's --

 4              MR. COHEN:  -- with red-line objections.  Would that

 5    be okay?

 6              THE COURT:  Yes, that's perfect.  Yes.  That's

 7    perfect.

 8              So how many officers do I have?

 9              MR. COHEN:  Just defendants?  Seven, plus a couple

10    witnesses --

11              THE COURT:  And then are you going to have someone

12    from the city as a representative?

13              MR. GREEN:  We could.  But, you know, of course,

14    they're all agents and such, too.  I think we're just going to

15    have my two colleagues at the table.  And we have one 30(b)(6)

16    possibly, but not to stay regularly.  I guess we would -- we

17    can just do --

18              THE COURT:  Well, I'm just trying to think of where I

19    put you all.

20              So I think that I -- I have -- it's just the two of

21    you, right?

22              MR. COHEN:  For the officers, yes.

23              THE COURT:  So that's nine -- nine --

24              MR. COHEN:  As of right now.

25              THE COURT:  And then -- and so we've got 9, 10, 11 --

1          MR. COHEN:  There could be someone coming in to help

2     with us, a third person potentially.

3          THE COURT:  So I have a smaller table -- a second

4     smaller table, but I'm wondering if it might be helpful to have

5     a larger table.

6          Are they all going to come every day?

7          MR. COHEN:  Yeah, I mean -- yeah.

8          MS. BAUER:  Yes, defendants --

9          THE COURT:  Would expect them to.

10          Okay.  I'll take a look at the layout and make sure.

11     Right now, best-case scenario would be that we can fit your

12     team at the table.  I'm not sure if we can.  And then we would

13     put you at the smaller table against the wall.  There are

14     displays on both sides, so you've got the same equipment.

15          You are nothing compared to what I'm trying to figure

16     out with the 34-defendant gang case that is only down to 31

17     right now.  Keeping my fingers crossed that that is going to be

18     cut considerably in the next few months.  Not sure where we're

19     going to -- we're going to have people sitting on each other's

20     laps, I think.

21          Okay.  So just so you know, when the jury comes in --

22     this is how jury selection will take place.  I will give them

23     some preliminary instructions, and the preliminary instructions

24     will have you introducing yourselves so that we can first find

25     out whether they know anyone.

1    And then also I will give them a proposed statement of

2    the case.  Now, I don't have an agreed one, so I'm going to do

3    it myself and I'll work on one that is -- because you didn't

4    agree, right?

5    And then I'm going to also read a list of witnesses.

6    Now, there's a number of witnesses that are objected to right

7    now.  I'll see if I make rulings on them in a moment.  But the

8    witness list should be inclusive rather than exclusive just in

9    case, and so I'll read them those witnesses to see if they know

10   any of those individuals.

11   Then we'll start by calling 14 jurors into the jury

12   box, and they will have a questionnaire -- do you have copies

13   of that for them?

14   LAW CLERK:  I do.

15   THE COURT:  And the questionnaire will include basic

16   questions regarding their background, work, family, habits,

17   what they do in their free time.

18   And then the big question that's critical is what

19   their interaction with the civil or justice -- I'm sorry, the

20   civil or criminal justice system is.

21   In this particular case, I would ask you to take a

22   peek at this and then see if there's any questions that you

23   feel we need to supplement this questionnaire with that would

24   go directly to the facts of your case that you are concerned

25   about.

1          The way that it will work is that I will do the

2     questioning using this format, this form.  And then we will

3     have a sidebar, probably after the first seven.  And at the

4     sidebar, we will bring over any questions that we want to ask.

5          So, for example, they will be informed that they can

6     ask for a sidebar to give me private feelings about things.

7     They also will be informed that any strong feelings that they

8     have must be expressed at sidebar.

9          I always tell the story, I made a big mistake early,

10    early in my career where I had a building inspector bribe case

11    and I was doing a jury selection, and I said, "How many of you

12    have worked with the City of Chicago's Building Department and

13    do you have any feelings about working with them?"  And one man

14    stood up about two hours in and he said, "I'm a contractor and

15    I've worked with the City of Chicago's Building Department for

16    30 years, and everybody in the department is corrupt and on the

17    take."

18         (Laughter.)

19         THE COURT:  And I said, "Oh."

20         So I now have changed my procedure -- because we do

21    learn from our mistakes -- and now I say, "You may have strong

22    feelings about law enforcement officers, you may feel that

23    they're wonderful and your family is filled with them and mom

24    is a cop and dad is a cop and brother is a cop, or you also may

25    feel that every cop that you've ever known has not been fair to

1   you and treated you improperly.  Those are strong feelings and
2   I need to know at sidebar about them."
3           When we are at sidebar, you lawyers may use your
4   lawyer skills to inquire as much as you want of the jurors
5   directly.  You can rehabilitate an answer if you feel that it
6   is a bad answer and you want that juror.  You can cross-examine
7   that juror.  And it's fair game.  So you have a lot of ability
8   in my courtroom to use your trial skills one-on-one.  You just
9   can't do it in a dog-and-pony show where you taint the whole
10  panel.  You do it one-on-one.  Okay?
11          So I will be calling over people who ask for a sidebar
12  or if I say, "Let me ask you about that at sidebar," but you
13  are free to say to me at sidebar when we're over there, "Judge,
14  can we call over Juror Number 4, she gave me this answer, I'm
15  concerned about it."  Absolutely fair game one-on-one, okay?
16  So that's the way it works.
17          You will make your motion-for-cause strike directly
18  after that sidebar.  Okay?  And then I'll rule.  So you will
19  know right when you sit down to go to the second half of the
20  jury whether or not you're going to make motions-for-cause
21  strikes, how many you have.
22          Now, I have seven officers and I have the city.  So
23  how are we -- have you proposed the number of strikes that you
24  want?
25          MR. COHEN:  We have not.

1          MS. BAUER:  No.

2          MS. GOMEZ-FEIE:  No.

3          THE COURT:  All right.  So normally we do three and

4     three; but with all of those officers, I'm going to -- I mean,

5     you have a lot of clients that might have a different feeling,

6     so I'm going to give the defendants collectively seven strikes,

7     okay?  And I'll give the plaintiff four strikes.  That's a

8     little bit more than usual.  But with all of those

9     personalities, I think that's a generous opportunity for you to

10    get a good jury.

11         I follow the Seventh Circuit Jury Project Plan since I

12    started 12 years, 13 years ago, which is that I have always

13    picked 12 jurors for my civil cases.  The idea is to get more

14    diversity and also to just make sure that if someone gets sick

15    or has a problem, they just drop off and you always have enough

16    left.

17         Is there anyone who objects to 12 jurors?

18         MR. DVORAK:  No.

19         THE COURT:  Okay.  I've never had a mistrial with it,

20    so it's -- it's worked.

21         Okay.  So that's the way we'll do jury selection.  And

22    as soon as we get what is the magic number, your exclusion of

23    strikes and for-cause strikes and the right number of jurors,

24    then we stop that process and we have you put your strikes on a

25    list, and you give them to me, and then we'll impanel the jury.

1    I can't imagine that you won't be able to get your jury on

2    Monday.  I think you will be able to.

3              MR. KUTNICK:  Judge, do you ask a question about

4    whether or not they have family members or friends who are law

5    enforcement?

6              THE COURT:  I do, yeah.  So if it's not on that list,

7    it should be.

8              MR. KUTNICK:  Okay.  It's not.  I didn't see it.

9              THE COURT:  Yes.  And usually we say City of Chicago

10   as well.

11             MR. KUTNICK:  Okay.

12             THE COURT:  This is the generic one --

13             MR. KUTNICK:  Okay.

14             THE COURT:  So you just move forward.  So law

15   enforcement.  And then I ask whether they have strong feelings

16   about law enforcement.  You get a lot of different answers.

17   Some people say they have very strong feelings, that they're

18   working really hard and, you know, they are unimpeachable, and

19   others just the opposite.  So it's important to know.

20             Anything else on that list that you see?

21             Do you want to know about anybody suffering from any

22   of the illnesses he suffers from?

23             MR. DVORAK:  Yeah, that's not a bad idea, actually.

24             THE COURT:  Right?

25             MR. DVORAK:  Yeah.

1          THE COURT:  I think maybe you might say -- what is it?

2    Diabetes and --

3          MR. DVORAK:  I would have to get back to you on the

4    complete list, but --

5          MR. KUTNICK:  And then also it could be problematic if

6    a juror doesn't want to necessarily disclose in public --

7          THE COURT:  But they can do it at sidebar.  So they're

8    given that -- you'll see how I do it.  They're given that

9    opportunity, you know, to say, "I don't want to tell you, but

10   I'll tell you at sidebar, you know, I have diabetes" --

11         MR. DVORAK:  Perhaps we could just limit it to

12   diabetes and -- because that's the one that's at issue in the

13   case about what's causing what.  They're all at issue, but

14   that's the main one that's really at issue.

15         MR. KUTNICK:  Carpal tunnel.

16         MS. BAUER:  Defendants would also want to know if

17   anyone has suffered from a kidney transplant --

18         MR. DVORAK:  Yeah.

19         MS. BAUER:  -- because that's at issue as well, I

20   mean, his renal failure medication --

21         MS. KOHLS:  Family or friends.

22         THE COURT:  It's all family or friends.

23         MS. KOHLS:  Oh, okay.

24         THE COURT:  Every question is you, people close to

25   you, family and friends, close family members.

1          MR. DVORAK:  If we start asking about heart

2     conditions, I mean, everyone is --

3          THE COURT:  Oh, my gosh, yes.  You might find a lot

4     have diabetes.

5          MR. DVORAK:  That's true, that's probably not --

6          THE COURT:  Anything else that would be particular to

7     this case?

8          MS. KOHLS:  The diabetes, the carpal tunnel, and

9     the --

10          MR. DVORAK:  Oh, carpal tunnel, yeah, or any kind of

11     wrist surgery maybe.

12          MS. KOHLS:  And --

13          MR. DVORAK:  Wrist or hand surgery.

14          MS. KOHLS:  The kidney.  But also, depending on the

15     rulings on the motions *in limine*, the C. diff issue potentially

16     as well.

17          THE COURT:  Okay.  Anything else?

18        (No affirmative response.)

19          THE COURT:  All right.  Everybody knows how to do jury

20     selection.

21          I'll start with plaintiff's motions, okay?

22          The first motion is to exclude his other lawsuit, his

23     prior lawsuit.  And apparently he sued someone?  For what?

24          MR. DVORAK:  Essentially -- remember the whole

25     incident I talked about where he fell in the hole?

1          THE COURT:  Yes, and he had his trigger finger?

2          MR. DVORAK:  I mean, clearly the facts of that case

3     are going to come up and had come up in the deposition.  We

4     don't have an objection to that.  Just the fact that he has a

5     lawsuit related to that I think would be prejudicial.

6          THE COURT:  Okay.  So it can be relevant, of course,

7     to proximate cause and to damages if there is some link to his

8     fall and if he's asking for damages that are similar to the

9     damages in this case, so I have no idea what's going on in that

10    case.  What is he seeking?

11         MR. DVORAK:  He's seeking damages for the trigger

12    finger that Dr. Urbanosky treated him for shortly after the

13    fall.  And, once again, we have no issue with any facts, any

14    causation, any relatedness, anything like that.  We're talking

15    about just merely the fact that there was a lawsuit.

16         THE COURT:  Right.  Well, filing of a lawsuit can show

17    bias, you know, but it also can show litigious nature, but it

18    can also be very prejudicial.

19         So what's the defense's position?

20         MS. BAUER:  And our position is basically what you

21    alluded to, your Honor, in relation to the damages.  These

22    things are closely linked.  So he's already filed a lawsuit for

23    the trigger finger.  And it's going to be difficult, if not

24    impossible, to be able to distinguish what sort of physical

25    therapy plaintiff needed as a result to his carpal tunnel

1    injuries, which plaintiff is saying is a result of the

2    handcuffing, which we dispute, or was it in relation to the

3    trigger finger prior to him ever coming into contact with these

4    officers.  And so I think that if they're going to go into

5    these damages, that we should be able to go into the fact that

6    he's already had that issue.

7              THE COURT:  But -- that he's seeking damages for the

8    same injury?

9              MS. BAUER:  Yeah, that he's already been compensated

10   for that issue.

11             THE COURT:  Oh, he's been compensated in the other

12   lawsuit?

13             MR. DVORAK:  It's not -- I think it's still pending.

14             MS. BAUER:  Is it still pending?  Okay.

15             MR. DVORAK:  And he is not seeking damages for that.

16             THE COURT:  Well, I don't know.  I mean, I think

17   proximate --

18             MR. DVORAK:  I'm sorry.  He's not saying -- he's not

19   seeking damages -- we're not saying -- he's not seeking double

20   damages.  He's seeking the damages for that incident in that

21   lawsuit and the damages for this in this lawsuit.

22             THE COURT:  All right.  What I will do is I'll take it

23   under advisement and I'll listen to his testimony, so this is

24   one you'll have to ask me at sidebar before you go up regarding

25   whether or not you can bring it in.

1      There's a very different way that this can play out.

2  It can play out cleanly and it will go more to proximate cause

3  and to the amount of damages, or it gets to that other issue,

4  which is the litigious nature of the plaintiff, which is more

5  prejudicial.

6      So I need to just hear it play out.  And then when it

7  plays out, we can give you some more guidance.  Okay?

8      MR. COHEN:  Your Honor, also there's a deposition

9  transcript from that other case that I would like to be able to

10  have the option to use it to impeach him.  I obviously would --

11  depending on how -- if we're going to keep out the -- that

12  other lawsuit, I would obviously do it by just saying, "You

13  gave sworn testimony in a hearing or in a proceeding" --

14      THE COURT:  In another proceeding.

15      MR. COHEN:  -- without saying what it is.

16      THE COURT:  That's correct.

17      MR. COHEN:  I don't think there's any reason I

18  shouldn't be able to use a sworn statement.

19      THE COURT:  There's no reason you cannot use the

20  statement.  It is under oath, and it is appropriate.  You just

21  can't say, "In this case when you sued so-and-so."  So it

22  depends on how it plays.

23      So before you cross, that's what we'll have to talk

24  about.  But you absolutely can.  And the proper way to do so is

25  say, "You gave this statement under oath or this testimony

1    under oath in another proceeding on this day."  Right?  Okay?

2         (No affirmative response.)

3              THE COURT:  All right.  As far as the lawsuit aspect,

4    we'll take that under advisement.

5              All right.  So barring evidence relating to the cause

6    of the plaintiff's arrest.  Did the defendants intend to get

7    into that?

8              MS. BAUER:  Not necessarily.  Our goal here is not to

9    prejudice plaintiff in relation to, you know, the charges.  The

10   issue here is that plaintiff is going to say I was handcuffed

11   for eight hours that day, I was in custody all day and I didn't

12   get access to my medication.  And defendant should have the

13   right to then say in some manner that is fair that he was in

14   custody because they were investigating a felony, and but for

15   this felony he would not have been arrested and he would not be

16   in custody in the first place.

17             THE COURT:  So there's no dispute that there was a

18   felony charge against him and that he was arrested on the

19   felony charge, correct?

20             MS. BAUER:  Correct.

21             THE COURT:  So I think that's fair enough.  It's just

22   the -- it's the domestic nature of the charge that is

23   prejudicial, not the fact that he was -- we don't want the jury

24   to infer that he was wrongfully arrested or to start

25   conjecturing about whether that was in retaliation for

1    something, right?

2            MR. DVORAK:  Well, I guess, first of all -- I guess

3    it's not correct that he was charged with a felony.  I think

4    they were investigating a felony.

5            THE COURT:  What happened to him in the end?

6            MR. DVORAK:  I think the state's attorneys -- well, I

7    guess depending on what -- I think the officers claim that --

8            MR. COHEN:  Well --

9            MR. DVORAK:  Yeah, go ahead.

10           MR. COHEN:  I can answer better since I've --

11           MR. DVORAK:  Yeah, yeah.

12           MR. COHEN:  -- spoken to the officers.

13           The state's attorney in the end continued the case for

14   investigation to get more evidence or something, and they ended

15   up releasing him.  He was never charged.  He was released and

16   he was going to potentially be charged in the future, and then

17   that never happened.

18           THE COURT:  Okay.  So he's never charged, but he's

19   arrested on a felony.

20           MR. DVORAK:  Well, they're investigating a felony,

21   sure.

22           THE COURT:  Right.  But that's why he's arrested.

23   It's not just they're investigating.  There's got to be a

24   reason for the arrest.  Otherwise, you would have charged a

25   false arrest claim.  Right?

1      MR. DVORAK:  I guess my issue is calling it a felony.

2  I mean, I don't think we have any issue saying you were

3  arrested, it was a proper arrest.  I mean, but felony, that --

4  that just has such a connotation to it.

5      MR. GREEN:  Your Honor, I would say on behalf of the

6  city, too, that -- I mean, that shows why they're doing police

7  service as well, even in the last incident of putting him in a

8  cage car because this is a felony.  And, you know, this is --

9      MR. KUTNICK:  If he was arrested for a domestic

10 battery, which is a misdemeanor, they would handle him the same

11 way.

12     MS. BAUER:  Not necessarily.  They wouldn't have

13 talked to the ASA.  He wouldn't have been in custody for that

14 long.

15     MR. DVORAK:  Oh, we were talking about the -- I think

16 Josh's comment was about --

17     THE COURT:  Okay.  I think that the mention of the

18 felony is not a problem.  So he's arrested on a felony.  And I

19 don't want any discussion regarding what the reasons were for

20 the arrest or any other actions regarding the arrest because

21 it's not relevant and hasn't been charged.

22     MR. COHEN:  Your Honor, this is --

23     MR. DVORAK:  Can we say that he was not charged,

24 though?

25     THE COURT:  No.

1            MR. DVORAK:  I mean said that he was not --

2            THE COURT:  No, because that suggests that they did

3       something improper.

4            MR. DVORAK:  But they're -- otherwise, they're going

5       to assume that he was a -- that he was charged with a felony.

6            THE COURT:  Well, he was arrested on a felony.  That's

7       the facts --

8            MR. DVORAK:  But he was not charged with a felony.

9            THE COURT:  What is he arrested on?

10           MS. BAUER:  Cyber-stalking and harassment.

11           THE COURT:  Is it a felony or is it a misdemeanor?

12           MS. BAUER:  It's a felony.

13           THE COURT:  How can you dispute the facts?

14           MR. DVORAK:  Because he was never charged with a

15      felony.

16           THE COURT:  But that doesn't --

17           MR. DVORAK:  That's my issue.

18           THE COURT:  Okay.  So --

19           MR. DVORAK:  They can say they were investigating a

20      felony.  I mean, I still dispute that --

21           THE COURT:  Okay.  I ruled, and I'm overruling your

22      objection.

23           MR. DVORAK:  Okay.

24           THE COURT:  He's arrested on a felony.

25           All right.  So barring evidence relating to Medicare

1  and/or other insurance coverage.

2        Is there any objection?

3        MS. BAUER:  Just -- did you want to --

4        MS. KOHLS:  Go ahead.

5        MS. BAUER:  Okay.  Just in relation to if he ends up

6  saying something to the extent of, you know, I'm completely

7  broke or I couldn't afford to -- you know, for a college fund

8  for my child, that's the only time we would bring it in.

9  Otherwise, it's the Collateral Source Rule.

10        THE COURT:  Well, I don't see how it brings in

11  anything even if he says I'm really broke.  I mean -- I mean,

12  you can raise an objection if you think that it's opened the

13  door, but this is granted.

14        Bar testimony or argument that an award to plaintiff

15  would burden the public taxpayers.

16        That's appropriate.  Anybody objecting to that?

17        MS. BAUER:  There's no objection.

18        THE COURT:  Okay.  Permit the plaintiff to treat the

19  defendants and all other officers as adverse witnesses.

20        In part, I don't understand why civil attorneys on

21  both sides don't want to let their witnesses testify.  You are

22  adverse to the portions of your complaint and your case that

23  are adverse.  You're not adverse to whether someone is a police

24  officer and has worked for ten years and where he's assigned

25  and what he does for a living.  That's not adversity.  It

1    should be direct examination when you are directing a witness,

2    until the point that you're in a hostile adverse situation,

3    which is once you dispute the facts of the case.

4            If you don't let your jury hear who these people are

5    by letting them tell the story a little bit, you're both doing

6    yourselves a disservice.

7            So adversity hits when the facts hit for adversity,

8    and you know when that is.  All right?

9            So non-leading questions for non-controversial issues

10   and matters.  Leading questions only during the areas where

11   someone is going to testify regarding the incident that is at

12   dispute and is in dispute.  Okay?

13           MR. GREEN:  Your Honor, just for the record, under

14   Illinois law for the Illinois claims, I think adverse ability

15   only is limited to the supervisors within the state law.

16           MR. KUTNICK:  I think there's a new Supreme Court rule

17   that allows cross-examination of any adverse witness.  I think

18   it's 7-11 -- not 7-11, 7 -- I forget the number.

19           MR. GREEN:  I was just wondering --

20           THE COURT:  But does it matter to me?  Why does it

21   matter to me in my procedural rule?

22           MR. GREEN:  Just for the state --

23           THE COURT:  Yes, but in evidentiary -- I mean, if I'm

24   in federal court using federal evidentiary rules -- it's not a

25   procedural rule like a filing rule or like -- it's the rules of

1    the courtroom, right?

2          MR. GREEN:  That's fine, your Honor.

3          THE COURT:  Yes.  So I don't think you have -- maybe

4    that's what happens over there, but not here.

5          Okay.  So that's granted in part based upon what I

6    just said.

7          Okay.  Bar the defendants from introducing evidence of

8    defendants' awards.

9          So I have no idea what kinds of awards these

10   individuals have, but it usually is just bolstering.

11         MR. COHEN:  We don't oppose it.

12         THE COURT:  Okay.  So it's granted.

13         Bar any argument that plaintiff failed to call certain

14   witnesses at trial.

15         Unless you have an adverse witness -- I mean, unless

16   you have a missing witness that is not within the control of

17   another party, this is an improper argument, so it's granted.

18         And then exclude evidence relating to the law

19   enforcement unit names involved.

20         Well, if you're assigned to a particular unit, it is

21   not -- it is absolutely not prejudicial.  That is a fact.

22         If you need a limiting instruction that says the fact

23   that he was involved in whatever, Special Unit Victims, has

24   nothing to do with the, you know, arrest or incident regarding

25   the plaintiff, that's fine.  But you don't sanitize it by

1  saying that he wasn't assigned to something.  So I don't know,

2  what's the big adversity?  Special Victims Unit?

3         MR. KUTNICK:  Special Victims Unit and the Marshals

4  Task -- Fugitive Task Force, which implies that he somehow is a

5  fugitive of justice --

6         THE COURT:  Okay.  So, no, they get to say where

7  they're from, and then I can -- I would be happy to propose an

8  instruction directly after that statement that says there is no

9  evidence that there is a special victims crime here or fugitive

10  crime here.  Boom.  That's what they do.  That's where they're

11  from.  All right?

12         Okay.  Defendant officers' motions then.

13         Bar any evidence, testimony, or argument that

14  conflates the violation of a general order or department

15  regulation with constitutional violation, which is essentially

16  saying follow *Thompson versus City of Chicago*.  It's granted.

17  You cannot argue that failure to follow a particular

18  government -- I mean police department order means that he is

19  in violation of 1983.  You can argue that as part of all of the

20  facts and circumstances this is something that was part of his

21  training, et cetera, it's fine.  So it's granted.

22         Bar any evidence of argument regarding the code of

23  silence.

24         It's absolutely not mentioned here.  *Monell* is out.

25  And so it's granted.  There's no reason.  It's highly

1    prejudicial.

2          Bar any evidence --

3          MR. DVORAK:  Can I clarify, Judge?  And this relates

4    to a few of the motions *in limine*.

5          THE COURT:  Sure, go ahead.

6          MR. DVORAK:  I would agree with your Honor as far as

7    that term "code of silence."  I guess the issue is going to

8    come up on a few of these that, you know, it is the standard

9    cross-examination to say, "You work with each other" --

10         THE COURT:  That's fine.  Fair game.

11         MR. DVORAK:  "You take care of each other," that kind

12   of thing.

13         THE COURT:  That's bias.  That's absolutely a

14   permissible area of cross-examination.  "You worked with each

15   other this long, you have been in dangerous situations

16   together," whatever it may be.  Completely fair game.  That's

17   bias.

18         "Code of silence," "blue wall" is a much broader

19   concept.  Okay?  And that is not permitted.

20         Okay.  Bar any evidence of misconduct alleged against

21   any of the defendants, including the other lawsuits.

22         So I don't know what you're thinking of doing here,

23   but maybe it's these two, *Anderson* and *Berkovich* cases.  Is

24   that right?

25         MR. DVORAK:  No -- we have no objection.

1          THE COURT:  Okay, great.

2          All right.  Bar any evidence, testimony, or argument

3    relating to the general allegations of police misconduct.

4          I assume you're not going to do a broad --

5          MR. DVORAK:  No.

6          THE COURT:  -- the-police-are-bad-people argument.

7          Okay.  It's granted.

8          Any argument that the jury should send a message to

9    the city.

10         MR. DVORAK:  No objection.

11         THE COURT:  Okay.  Great.

12         And any evidence that the city improperly disciplines,

13   because your *Monell* is out.

14         MR. DVORAK:  No objection.

15         THE COURT:  Okay.  And then any evidence regarding

16   whether the defendant officer ever reported misconduct.

17         MR. DVORAK:  I don't have an objection, but I could

18   see where the -- they could open the door to this by saying,

19   "Oh, if that would have happened, I would have certainly

20   reported that" or, you know -- I don't have objection to the --

21         THE COURT:  Well, that would really be speculation in

22   many ways, too.

23         MR. DVORAK:  Yeah.

24         THE COURT:  It could just be an evidentiary -- it

25   could just be an objection in the courtroom at the time if you

1    were to do that.

2         MR. DVORAK:  Okay.

3         THE COURT:  Yeah.  I don't -- it's hard for me to do

4    this in bare bones without, like, facts on it.

5         MR. DVORAK:  Exactly.

6         THE COURT:  So I'll grant it with your opportunity to

7    raise it if you think something was done wrong.

8         Evidence or argument criticizing any investigation by

9    the city.

10        MR. DVORAK:  Well, if it's limited to IPRA, then I

11   would agree, because there was -- I don't know if there even

12   was really an IPRA investigation in this.  We filed our

13   lawsuit.  I don't think we ever made any statements to IPRA.

14   Whether they investigated or not, I don't think they did.

15        THE COURT:  Was there an IPRA investigation?

16        MS. KOHLS:  There always is when there's a lawsuit

17   filed.  It's standard --

18        THE COURT:  Oh, okay.

19        MR. COHEN:  There might be an IPRA file --

20        THE COURT:  Okay.  So IPRA is out because that's

21   something that's completely complicating and confusing for a

22   jury, and we don't want a finding one way or the other to

23   become the finding of this jury because that's the overly

24   prejudicial aspect of it.  But is there some other aspect that

25   you can think of?

1          MR. DVORAK:  Well, I just think it's broadly stated

2     any City of Chicago investigation.  I mean, that might go to

3     any kind of cross-examination of the officers.

4          Here's one thing in particular I'm talking about:

5          So they picked him -- picked up Mr. Macaluso on this

6     possible felony.  They didn't not charge or charge.  Instead,

7     the state's attorney said I need more evidence or -- but if you

8     look at the supp. reports, there was zero investigation

9     actually done between that day and let's say it was eight

10    months later after the lawsuit was filed.  Then all of a sudden

11    there's an entry in that supplemental report seven or eight

12    months later that talks about, Oh, by the way, you know, when

13    Mr. Macaluso was with me -- I forgot exactly what they said,

14    but they make statements related to asking for medical care,

15    et cetera.

16         So I think that may become a topic of

17    cross-examination of, Okay, you wait eight months later on this

18    case you did nothing on to suddenly put in statements about

19    what Mr. Macaluso said or didn't say.

20         THE COURT:  Right.

21         MS. BAUER:  And then our response to that then is that

22    we would be able to bring in all the investigation that was

23    done prior to his arrest.  And that goes into all the

24    statements that he made on the Yelp review -- that was the

25    investigation that was done.  It was done before he was

1    arrested.  So if you want to bring in any issues in relation to

2    the investigation, then we get to bring in the entire

3    investigation in relation to what these officers did.

4          MR. DVORAK:  Okay.  Well, I'm talking to the judge,

5    but -- so -- so, no, what counsel is talking about is

6    investigation done before that date.  I'm talking about there

7    was zero investigation done after that date.  There was no

8    entries in the supp. report that he did anything other than

9    nine months later he says, Oh, by the way, you know, nine

10   months ago, Macaluso said this.  So I think that's fair game.

11         MR. COHEN:  I don't think that was really what this

12   motion *in limine* is about, though.  I mean, it's -- it's not

13   really -- it's talking about an investigation by an agency of

14   the city.  It's not really --

15         MR. DVORAK:  If it's limited to that.  I'm just -- I'm

16   just saying I don't want to agree to something and later on you

17   said, Oh, but you agreed not to bring in the investigation and

18   that's covered in that motion *in limine*.

19         THE COURT:  All right.  So based upon the proffer that

20   I've just heard, it sounds to me, first, that this motion is

21   granted.  But regarding your supplemental issue,

22   cross-examining an individual regarding a report and when he

23   made statements and when he supplemented that report is fair

24   game.  I mean, I don't see that it's not.  The question then is

25   whether it was supplemented based upon another investigation.

1    And if it was supplemented based upon a further investigation

2    into the original charges, that's the way that it would come

3    out.  Not, again, about battery or stalking or whatever else it

4    may be, but, rather, regarding the investigation because we're

5    going to sanitize that.

6              So, you know, you can certainly justify it if that's

7    what happened.  I'm just, again, in a vacuum on the facts.  But

8    it is fair game to say later on something was added that wasn't

9    in the original report.

10             All right.  Bar any evidence that they will be

11   indemnified.

12             I think that should be probably agreed upon.  Right?

13             MR. DVORAK:  Unless implied otherwise.  That was my

14   comment here.

15             THE COURT:  Okay.  Fair enough.  Okay.

16             Bar any undisclosed witnesses.

17             Well, we're going to go through those.  The only

18   witness that you have is Sharon Macaluso, so that's who you

19   intend to be calling?

20             MR. DVORAK:  As far as a lay witness, yes.

21             THE COURT:  Okay.

22             All right.  So non-witnesses from the court --

23   non-party witnesses from the courtroom.

24             Okay.  So this one I will grant.  But you all need to

25   be vigilant because I won't know who they are.  And they tend

1    to wander in and sit down, so please kind of keep checking the
2    door when the door opens and make sure.  I don't know who they
3    are, but it's not appropriate to have them there.
4            Experts are permitted to listen to the expert
5    testimony of the other expert.  So if you want, that's not
6    inappropriate.
7            Now, other lay witnesses from rendering testimony.
8            This is what we were getting to when you were giving
9    me your factual scenario.
10            So who was disclosed as a medical expert in this case
11    on both sides?
12            MR. DVORAK:  Which motion *in limine* are we on?
13            THE COURT:  Twelve.
14            MR. DVORAK:  We're on 12.  I see.  Okay.  Got it.
15            Do you have the 26(a) disclosure?
16            THE COURT:  You can just tell me.
17            MS. BAUER:  It was plaintiff's Dr. Chugh.  And then it
18    was defendants' --
19            THE COURT:  Wait.  Say the name?
20            MS. BAUER:  Dr. Chugh.  C-H-U-G-H.
21            THE COURT:  Okay.
22            MS. BAUER:  And then it was defendants' Dr. Rezania.
23    R-E-Z-A-N-I-A.
24            MS. KOHLS:  And defendants' Dr. Sergio Rodriguez.
25            THE COURT:  Okay.  So all of them are giving us expert

1    testimony?

2              MR. DVORAK:  And Dr. Leah Urbanosky as well.

3              MS. BAUER:  And we would object to that, as she was

4    not disclosed as an expert.

5              THE COURT:  Okay, Ranosky -- oh, Urbanosky.  So let's

6    talk about her now.

7              So did you give a disclosure and a conclusion as to

8    what she was going to testify to to the other side in the time

9    frame that was required?

10             MR. DVORAK:  Yes, your Honor.  We filed a 26(a)(2)(C)

11   disclosure of treating physicians and other healthcare

12   professionals.  And the rule itself talks about expert

13   witnesses -- disclosure of expert witnesses who are treaters

14   who will testify as to certain things.  And we indicated that

15   Dr. Leah Urbanosky is an orthopedic hand surgeon who treated --

16   I can go through the whole thing.  It's a paragraph long,

17   but --

18             THE COURT:  I think they have a -- is that it?

19             MS. KOHLS:  That's a copy, yeah, if you want to look

20   at it.

21             THE COURT:  Sure, I'll take a peek.

22             MR. DVORAK:  So I guess if there's an extra copy, your

23   Honor could read it.

24             THE COURT:  I can.

25             MR. DVORAK:  I should also note that in addition to

1    that disclosure, in her actual treating notes she indicated

2    this was caused by handcuffs, and also to -- her deposition was

3    taken during discovery where she gave the same opinion that the

4    handcuffs were disclosed -- or, I'm sorry, were -- caused the

5    two surgeries and the -- the handcuff injuries, the -- what do

6    you call it -- the carpal tunnel.

7              THE COURT:  Can I have the Civil Procedure book?

8              LAW CLERK:  Yes.

9              THE COURT:  Okay.  And your positions?  Defense?

10             MS. KOHLS:  I don't think in that disclosure they

11   specifically say that the handcuffing was -- or, excuse me, the

12   injury was caused by the handcuffing.

13             THE COURT:  May also testify as to the causation or

14   causal relationship between injuries sustained by plaintiff

15   during his arrest and the period spent in custody.

16             MS. KOHLS:  Okay.

17             THE COURT:  And his present medical condition and to

18   the prognosis and/or permanence of his ongoing medical

19   problems.

20             Okay.  So, you know, this is -- I'm going to go

21   through the rules with you, but -- do you have my book for me?

22             LAW CLERK:  Yes.

23        (Tendered.)

24             THE COURT:  So the rule of 702 requires that it would

25   actually say that she will conclude that cuffing caused carpal

1    tunnel syndrome.

2         So let's talk about this because 26(a)(2)(C) has some

3    very specific language.

4         Okay.  It's (2)(C), Subsection (1) and (2) that's so

5    important.

6         Witnesses who do not provide a written report.  The

7    subject matter on which the witness is expected to present

8    evidence, and then the summary of the facts and opinions to

9    which the witness is expected to testify.  And that must be

10   disclosed at least 90 days before the date set for trial.  And

11   if it's intended solely to contradict, then would consider them

12   a rebuttal.

13        So at what point did you say that she was going to say

14   that the carpal tunnel syndrome was caused by handcuffing?

15        MR. DVORAK:  Well, first of all, I will say that it

16   was in her actual report, which they got from day one of our

17   disclosures.

18        THE COURT:  Okay.  Where is that?

19        MR. COHEN:  It's not an expert disclosure.  It's just

20   her -- we're just talking about her medical notes --

21        MR. DVORAK:  We're talking about the actual written

22   piece of paper that says that this was caused by handcuffs.

23        THE COURT:  Okay.

24        MR. DVORAK:  Second of all, we took the deposition way

25   before 90 days.  We took her deposition, and she did

1    specifically give opinions that the cuffing caused the

2    injuries.  So -- and I think -- I mean, perhaps this was not as

3    specific as it could have been, we wanted to be inclusive

4    rather than exclusive, but I think the combination of those

5    three things, certainly -- there's no way the defendants can

6    claim that they were -- are surprised by the opinion that

7    Dr. Urbanosky gave in her videotaped deposition that the

8    handcuffing was related to the injuries.

9            Now, whether or not there was a technical -- maybe

10   didn't -- I'm not saying it didn't meet the rules.  I'm just

11   saying even if one would say it wouldn't quite meet the rules

12   because maybe that specific language should have been in there,

13   there's also a prejudice component and an actual notice

14   component to this.  And they certainly were -- they absolutely

15   knew, 100 percent.  They cannot claim with a straight face that

16   they did not know that she would give this opinion.

17           THE COURT:  Okay.  Let me hear from the other side.

18           MS. BAUER:  I think the issue is that there should

19   have been an expert report like there was done on Dr. Chugh.

20   And I'm not sure what plaintiff is referring to with regards to

21   as this piece of paper.  Either defendants disclosed a report

22   that was drafted by her for the purposes of this litigation or

23   they didn't, or it's in relation to her medical records.  And

24   Dr. Urbanosky was re-deposed in this case, and so what ended up

25   coming out the second time was this causation piece, wherein

1 | the first time all Dr. Urbanosky could say was, Well, the
2 | injuries were consistent with what he had reported to me, and
3 | that's all I know.  Whereas defendant -- or plaintiff
4 | specifically brought in Dr. Chugh for expert purposes.  They
5 | did not do that for Urbanosky.  So this should not be available
6 | at this late point.

7 |        MR. DVORAK:  Your Honor, I dispute that that was the
8 | extent of what her deposition was.  We could always obviously
9 | show your Honor what the deposition was --

10 |        THE COURT:  Yeah, I would have to see.

11 |        But this is a really common problem in civil
12 | litigation.  And I will explain to you specifically how the
13 | rules work.  And there's case law on this as well.

14 |        Rule 26 is your disclosure obligation.  But Rule 26
15 | triggers 702.  And 702 gives you very concrete obligations.
16 | 702 says not only would it be, you know, her conclusion, but
17 | it's her specialized knowledge so that I can make my screening,
18 | as I must, my gatekeeping decision.  So I need to know her
19 | specialized knowledge.  I need to know that it was based on
20 | sufficient facts or data.  We don't have any problem with that.
21 | She treated him, right?  And then the testimony is the product
22 | of reliable principles and methods.  I mean, I'd have to know
23 | whether she's someone that could make that conclusion based
24 | upon her experience.  And then whether or not she's reliably
25 | applied the principles and methods.

1    So if you look at what you disclosed under, it says --

2    the only clause that you're hanging your hat on, she didn't

3    need to file a written report.  And that's what you're saying,

4    fine, she didn't need to file a written report because we had a

5    report of her medical treatment.  But then it says it must

6    state, one, the subject matter on which the witness is expected

7    to present evidence under 702, 703, and 705, and a summary of

8    the facts and opinions.

9        So that is the disclosure part that is missing here on

10   a 702.

11       It's has to be she treated him, she has the expertise

12   in hand surgery and carpal tunnel syndrome such that she can

13   reach the conclusion based upon my 15 years of treating people

14   with hand injuries, I've done "X" number of carpal tunnel

15   syndrome surgeries, and I conclude that a force of a handcuff

16   for this number of hours would have caused this injury.

17   There's a completely different conclusion there than simply I

18   treated him for carpal tunnel syndrome and it's consistent with

19   what he told me happened to him.

20       That last one is about as close as you can get without

21   a 702 report.  So --

22       MR. DVORAK:  I would say that the deposition itself

23   gave all of those things that your Honor talked about.

24       THE COURT:  All right.  Well, I'll take a look at it

25   then, and I'll take it under advisement.

1      But for future reference, folks, 702 is there for one

2  purpose, and the purpose is that the gatekeeper has to

3  determine whether it's fair game.  And that is how the game is

4  played.  You give me her expertise.  It's usually her C.V.

5  It's usually her background, her training.  And then you say

6  that she's going to say this based upon that training and

7  conclude that.  And then that gives the opposing side the

8  opportunity to object either to her background or to her

9  conclusion.  And it's not just her treatment report.

10      MS. GOMEZ-FEIE:  Judge, just for the record, this

11  would be highly prejudicial to the defendants because then

12  going, you know, in this case, had the defendant thought

13  about --

14      THE COURT:  Right.

15      MS. GOMEZ-FEIE:  -- any treater --

16      THE COURT:  That's the whole purpose of 702.

17      MS. GOMEZ-FEIE:  Correct.

18      THE COURT:  Then you could have -- then you could have

19  brought in someone else because her conclusion would have to be

20  something much more concrete, like this:  The number of hours

21  of pressure on a particular vein or tunnel or something.  And

22  then you could -- then another expert could say:  No, four

23  hours or six hours isn't sufficient to cause, you know,

24  complete carpal tunnel collapse.  This is the kind of land

25  we're talking about.

1      MR. DVORAK:  Your Honor, but here's the problem.  What

2    counsel just said is absolutely not the case, because what

3    counsel just said is had we known this, we would have hired our

4    own expert.  They did hire their own expert.  They said -- and

5    they have an expert who is going to testify that I disagree

6    with Dr. Urbanosky's conclusion that the handcuffs caused the

7    injury.

8      THE COURT:  So then there's no prejudice.  You did

9    hire your expert.  You hired an expert?

10     MS. BAUER:  We -- it wasn't in relation to

11   Dr. Urbanosky's conclusion.

12     MS. GOMEZ-FEIE:  Correct.

13     MS. BAUER:  What our expert is going to say is that

14   based on a test that was not done by Urbanosky, based on an EMG

15   test, which has to do with how the nerve responds when

16   stimulated, that it is clear that this is not actually an issue

17   that was caused from handcuffing, period.  This has nothing to

18   do with Urbanosky's conclusion.

19     MS. GOMEZ-FEIE:  Correct.

20     MS. BAUER:  This has to do with the whole case.  This

21   is plaintiff's theory.

22     THE COURT:  I'll take a look at the deposition, so I

23   need a copy of it.

24     MR. DVORAK:  Okay.

25     THE COURT:  And it will be both sides.  And then if --

 1    so any supplemental filings on this issue shall be made by

 2    Friday -- oh, no, no.  When are we going to trial?

 3             LAW CLERK:  Not until the 30th.

 4             THE COURT:  The 30th?

 5             So let's do it by next Friday at the latest.

 6             MR. COHEN:  Are we going to have the transcripts by

 7    then?  I forgot the date.

 8             MS. BAUER:  Of the second deposition?

 9             MS. KOHLS:  We can get it by then.

10             THE COURT:  You have to get it done.  We've got a

11    trial date.

12             Okay?  So I'll take a look.  You can file supplemental

13    filings.  You can cite to case law on it as well.

14             But for future if you're going to have a trial in

15    front of me, it's really a specific rule that is triggered by

16    that concept.

17             And it's very prejudicial on both sides.  It can be

18    prejudicial that you don't get it in, and it can be really

19    prejudicial if it comes in without an opportunity to respond to

20    it, so it's a really important rule.

21             All right.  Taken under advisement with supplemental

22    briefing due Friday, the --

23             LAW CLERK:  The 20th.

24             THE COURT:  20th?

25             LAW CLERK:  I think so.

1          THE COURT:  Okay.  All right.  Number 13 is to bar the

2     testimony of --

3          MS. KOHLS:  Your Honor, if I may, on Number 12?

4          THE COURT:  That's what I'm on, yeah.

5          MS. KOHLS:  Just going back to the one you're taking

6     under advisement, that also we wanted to bar the plaintiff

7     himself as well from making any --

8          THE COURT:  Oh, yeah.  So he can -- this is kind of

9     what I said before about his feelings, you know.  He can't say,

10    "My blood pressure increased."  He can say, "I think my blood

11    pressure was increasing."  And you could say, "Why?"  "Because

12    my heart felt like it was racing and I was flushed" or, you

13    know, whatever else.  He can describe his symptoms, but he

14    can't make these conclusions of medical analysis, unless

15    literally he says, "I looked down at my Apple watch and my

16    heart rate was 120," which, by the way, nowadays you can do.

17    And some testimony will be like that, but not -- unless he did

18    that, we don't have an analysis.

19         MR. DVORAK:  And just so your Honor knows, though,

20    that Mr. Macaluso -- first of all, he does have some sort of

21    medical background, you know, not -- not saying a doctor, not

22    saying disclosed as an expert, but he did study chiropractory,

23    so he has some sort of medical background.  But he knows his

24    medical condition better than any plaintiff I've ever seen

25    in --

1          THE COURT:  Yes, so --

2          MR. DVORAK:  -- my entire life, and he can describe it

3    in medical terms that are extremely detailed.

4          THE COURT:  Well, if he's going to describe his

5    medical condition without describing what he believes are the

6    symptoms -- like his condition, how he felt at that moment and

7    his experience with treating himself, you know, "I felt like

8    this, which is consistent with when my blood pressure rises,"

9    right?

10         MR. DVORAK:  Sure.

11         THE COURT:  That's the way it can come out.  But he

12   can't say, "My blood pressure rose," period.

13         MR. DVORAK:  Okay.

14         THE COURT:  We don't know if it did or not.  Nobody

15   was there to tell us that.  So it has to be based upon his

16   experience.  And I know people that have serious medical

17   conditions, you know, they become little medical people

18   themselves.  You have -- some people actually, like my mom,

19   take their blood pressure regularly throughout the day because

20   it's parts of her condition.  So, you know, they know.  They

21   know the symptoms of what it feels like.  But until they

22   actually put the cuff on, they don't know what the number is to

23   actually say it's increased.

24         MR. DVORAK:  Sure.

25         THE COURT:  But they can say, "I felt dizzy, I felt

1    lightheaded, which made me think that my blood pressure had

2    dropped, that's the way it does -- that's what happens when it

3    does in the past, and I take my blood pressure all the time,"

4    and da-da-da. That's how it would come out. Okay?

5         How does that translate on the record? Da-da-da?

6    (Laughter.)

7         THE COURT: Can we get to 13 or no?

8         MS. KOHLS: Yes.

9         THE COURT: All right.

10        MR. DVORAK: No objection.

11        THE COURT: So -- oh, CPD personnel being paid to

12   appear in court.

13        You know, it's -- I suppose it becomes an issue where

14   you think that this is somehow prejudicial. If a police

15   officer is on duty and they have to appear for court, and

16   normally they are paid to be on duty and do their job, I don't

17   see what's prejudicial about that.

18        MR. DVORAK: Honestly, I don't plan --

19        MS. KOHLS: I think Mr. Dvorak --

20        MR. DVORAK: -- on going into it.

21        THE COURT: Okay. All right.

22        MR. DVORAK: No objection.

23        THE COURT: So it's granted then. It's silly. It's

24   not a very effective cross, anyway.

25        MR. DVORAK: Yeah, I just wasn't going to do it.

1         THE COURT:  Okay.  Bar any argument the defendants

2  have delayed the trial or that the plaintiff has waited a long

3  time for trial.

4         MR. DVORAK:  No objection.

5         THE COURT:  Okay.  What about Dr. Chugh's testimony

6  regarding the C.D. or whatever it's called?

7         MR. DVORAK:  So -- you guys can do this.

8         THE COURT:  Go ahead.  It's the city?

9         MS. KOHLS:  Oh.  Yes.  So if you look at Dr. Chugh's

10  testimony in his deposition and if you look at his expert

11  report, he opines that this accident caused the C. diff.  But

12  when he was actually asked about it at his deposition, he said,

13  no, I have no way of knowing whether this caused that and

14  caused C. diff.

15         So we just don't understand how that could ever come

16  in under 702 and under the *Daubert* rules.

17         THE COURT:  How did he write the report saying it

18  could and then be deposed saying it couldn't?

19         MS. KOHLS:  I don't know.

20         MS. GOMEZ-FEIE:  Good question.

21         MS. KOHLS:  I mean, I really don't know.  I think --

22  it's a good question.  I mean --

23         MR. DVORAK:  Cross-examination does some -- does good

24  sometimes, right?

25         MS. KOHLS:  Yeah, I mean, he's specifically asked:

1          "Is it your opinion that Mr. Macaluso developed a

2     staph infection on his cheek and nose from an abrasion on his

3     forehead?"

4          His answer was:  "I don't know that."

5          So once you get rid of -- I mean -- so he has no --

6          THE COURT:  Well, the question is whether it just goes

7     to cross-examination or whether it really makes the expert

8     opinion irrelevant because it's not based on, you know, the

9     *Daubert* standard --

10          MS. KOHLS:  I definitely --

11          THE COURT:  -- being reliable.

12          MR. DVORAK:  Just for the record, because I think

13    Mr. Bleifuss can explain the opinion better, I guess -- can you

14    explain what the opinion is?  The basic gist of mine is I

15    suppose it goes to weight and credibility.

16          MR. BLEIFUSS:  In his report, he describes the -- the

17    causal chain is that there's the accident at the -- in the car

18    accident, which subsequently results in a staph infection on

19    the face, and then he's administered antibiotics, which

20    decimate the --

21          THE COURT:  The good flora, yeah.

22          MR. BLEIFUSS:  Yes.  And then he has a C. diff

23    infection in his gastrointestinal system after he's -- the

24    cycle of antibiotics.  But under I think effective examination

25    by defendants, it is a bit more complicated.

1    THE COURT:  I think I'm going to have to look at it.

2    I'm going to have to look at the report and the deposition.

3    MS. KOHLS:  I did bring the deposition.

4    THE COURT:  Okay.  So I can see that.  But it's

5    really -- so it's really a *Daubert* challenge now, right?

6    MS. KOHLS:  Yes, it is.

7    THE COURT:  So I think it's going to need the

8    supplemental briefing on it, okay?

9    So Friday, any supplemental briefing on keeping out

10   the C. diff conclusion by Dr. Chugh.  It's really --

11   MR. DVORAK:  Could we have a moment?

12   THE COURT:  Yeah, as to whether we need to do that?

13   Yeah, go ahead.

14   Do you want to take a break?  Does everyone want to

15   take a break?

16   MR. DVORAK:  Yes.

17   THE COURT:  What time is it?  I don't have my watch

18   today.

19   MR. COHEN:  11:37.

20   THE COURT:  Okay.  Why don't you go ahead and take ten

21   minutes.  And if you want to use bathrooms, we'll open up the

22   jury room, too, so you can have a bathroom break.  Okay?

23   (Recess taken from 11:36 a.m. to 11:49 a.m.)

24   (Off-the-record discussion.)

25   THE COURT:  So we're going to -- I'm taking a look at

1     the Dr. Chugh, C-H-U-G-H, transcript regarding the C. diff.

2     And I think I'm on page 47.

3          (Counsel conferring.)

4               THE COURT:  (Reading:)

5               "Is it your opinion that Mr. Macaluso developed a

6     staph infection on his cheek and nose from an abrasion on his

7     forehead?

8               "I don't know that.

9               "Does the fact that Mr. Macaluso is taking

10    immunosuppressants and has been for many years make it more

11    likely that he would be susceptible to bacterial infections

12    such as staph?

13              "Yes.

14              "Does the fact that Mr. Macaluso has had multiple

15    health conditions, such as kidney failure, kidney transplant,

16    long-term diabetes, a stroke, and heart disease, make it more

17    likely that he would be subject to infections?

18              "Yes."

19              MS. KOHLS:  And then the plaintiff does try to

20    rehabilitate him a little bit on pages 65 to 66.

21              THE COURT:  Thank you.

22              And it just goes on then to the immunosuppressant

23    drugs?  There's no more on the C. diff?  That's it entirely?

24              MS. KOHLS:  Well, he testified probably more than that

25    on the C. diff.  I don't have all the citations to that.

1          THE COURT:  Okay.  All right.  And then can I see his

2     original report?  Do you have that?

3          MS. KOHLS:  I have his original report, yes.

4          (Tendered.)

5          THE COURT:  So his report conclusion is more probable

6     than not the patient developed the C. diff related to

7     antibiotic use from earlier in the year.  And then the

8     deposition says I can't say that the actual injuries that he

9     had with the C. diff were from the antibiotics.  Correct?

10          MS. KOHLS:  Not regarding the antibiotics, but he's

11     talking about the connection -- so to get to the antibiotics,

12     you first have to connect the abrasion to the forehead to the

13     mark on the nostril and the cheek.

14          THE COURT:  So where is his C.V. or any information

15     regarding his background?

16          MS. KOHLS:  I did not bring that with me.  I don't

17     know if the plaintiff has that with them.

18          MR. DVORAK:  Did you challenge his qualifications?

19          MS. KOHLS:  I'm not challenging his qualifications.

20     I'm just challenging the methods that he used, that they have

21     no backing, that he basically says it's possible, but doesn't

22     really have any backing for that.

23          THE COURT:  Yes.  So he did not make an ultimate

24     conclusion.  I mean, that's the thing.  Even in this one -- I

25     mean, here he made the conclusion, but there he backed off of

1   it.

2          So it has to be that the ultimate conclusion is what

3   you're getting the testimony regarding.  And if the ultimate

4   conclusion is C. diff came from the fact that -- you know,

5   that's what you want.  You want the ultimate conclusion.

6          So it's very speculative and, therefore, I'll strike

7   his testimony under 702.  Grant the motion for *Daubert*.

8          MS. KOHLS:  Thank you, your Honor.

9          THE COURT:  Okay.  So let's move to barring the

10  evidence that the plaintiff is disabled.

11         I mean, it has a term, you know.  Are you going to

12  argue maybe he has plenty of medical conditions or --

13         MR. DVORAK:  Well, it can work both ways because we

14  also don't want the jury to think that his medical bills were

15  all paid for by --

16         THE COURT:  Yes, Social Security Disability or

17  something.

18         MR. DVORAK:  Yeah, so I don't think we plan on, you

19  know, using that term.

20         THE COURT:  I mean, you're certainly going to tell

21  them all about his medical conditions.

22         MR. DVORAK:  Exactly.

23         THE COURT:  So "disability" has such a charged

24  understanding where it triggers certain rights to be protected.

25  And so to the extent that, you know, that word has that legal

1    terminology, that he's been defined as disabled under the

2    Social Security Administration or by someone else, it can be

3    prejudicial to the defense.  So I have no problem with you

4    using all of his conditions and explaining all of his concerns

5    and then staying away from "disability."

6         MR. DVORAK:  Yes.  I will definitely tell the

7    plaintiff that.  My concern is that, you know, the word might

8    be used in a more lay kind of way.

9         THE COURT:  I don't think that we will have trouble

10   with it.  You can object if that comes out.  And I'll explain

11   to the jury that we're not, you know, dealing with a disability

12   where you as a jury need to make any determination regarding it

13   in that regard.

14        MR. COHEN:  Other than -- aside from his legal status

15   as a disabled person, I was thinking also about, you know, just

16   an argument where he says I'm -- I'm in the cell and I'm on

17   medication, I'm disabled, they won't take me to the hospital,

18   you know, that sort of thing, because I think it's just a

19   prejudicial term.

20        THE COURT:  Well -- but that does trigger the legal

21   issue.  When you say you're disabled, they're going to start

22   conjecturing what is the police's obligation to protect a

23   disability and to give him the conveniences that he needs to

24   protect that disability.

25        So let's try to stay away from it.  If he says it, you

1    know, I might have to give a limiting instruction to them at

2    the time.

3            MR. DVORAK:  Sure.

4            THE COURT:  Okay?  So that's granted.

5            And then unrelated medical conditions.

6            What else does he have?

7            MS. KOHLS:  The stroke.  The staph infection that we

8    just talked about in the motion *in limine* 15.  The C. diff.

9            MR. COHEN:  Eye problems.

10           MS. KOHLS:  I don't know what else he might come up

11   with.

12           MR. COHEN:  He's got a lot.

13           MR. DVORAK:  Well, first of all, I mean, I understand

14   your Honor has ruled the C. diff out, but it's already come up

15   in Dr. Urbanosky's deposition just insofar as -- well, actually

16   I don't know if it came out.  I think she might not have said

17   the word C. diff.

18           MS. BAUER:  It was a different infection that he got.

19           MR. DVORAK:  Oh, okay.  Okay.  Anyway, I don't plan on

20   introducing anything about C. diff.  A stroke?  I mean that may

21   be part of his whole overall medical condition.  I don't see

22   necessarily why you would have to keep out all of his medical

23   conditions.  I think you can -- you can keep out any arguments

24   that those conditions are an issue in this case.  I mean, we're

25   not saying that, you know, they didn't treat him for a stroke

1    or anything.

2            THE COURT:  But when and why?  And why is it relevant?

3    Is there some manifestation of his behavior as a result of the

4    stroke that is implicated in this case?

5            MR. DVORAK:  I guess my concern is -- again, I don't

6    intend on going into any of this -- but he has such a long and

7    complicated history, so when he tells his story, it's going to

8    be a little bit difficult to tell him never mention the word

9    stroke, never mention this part, never mention this part.  You

10   know?  I certainly don't plan on going into it.

11           MS. KOHLS:  And that's why --

12           MR. DVORAK:  I just don't see any prejudice if it --

13   is if it does come out that he's had those in the past.

14           MS. BAUER:  I think that the issue then becomes what

15   is the jury going to determine the damages actually are in this

16   case.  And so there are so many, and there -- he doesn't have a

17   claim in relation to the stroke aspect.  I mean, he has a claim

18   in relation to the blood pressure medication, the kidney

19   transplant, and his insulin.  But there's no other testimony or

20   evidence in relation to the others, and I just think it gets

21   confusing for the jury.  And also it goes to, you know,

22   plaintiff shouldn't be able to say those things, and that's

23   what motions *in limine* are.  We -- we instruct our clients or

24   witnesses not to say certain things, and that's just the way it

25   goes.

1          MR. COHEN:  Your Honor, it's also -- in addition to

2     being -- some of these things, in addition to be irrelevant,

3     are just prejudicial.  I mean, this man's -- when you hear his

4     entire medical history, he's very -- you know, he's going to

5     become very sympathetic because he's had a very long, troubled

6     life in terms of his medical background, and certain things

7     like his stroke just have nothing to do with this.  And it's --

8     when you add them all together, it makes him very sympathetic.

9          THE COURT:  Yes, but the sympathy isn't your

10    prejudice.  The prejudicial part that you need to be concerned

11    about is that certain of the ailments that he's complaining of

12    actually can be related to things like stroke.  So high blood

13    pressure, for example, which he's saying they prevented me from

14    having high blood pressure medicine, saying that he had a

15    stroke in the past is overly prejudicial that they're going to

16    cause a stroke now or something like that.

17          So I will say -- instruct him that the key ailments

18    that he is concerned about and has made his complaint regarding

19    are the kidney, the high blood pressure, right?  And one more.

20          MR. COHEN:  The wrist?

21          THE COURT:  The wrist, the carpal tunnel.

22          And so if he does say anything about his medical

23    condition other than those things, then the judge is going to

24    instruct the jury that that's not relevant for their

25    consideration.

1          So to the extent that you can prevent him from going
2    into unrelated medical history, you should try to.  I
3    understand what you're saying to me and projecting to me that
4    he may not be able to tell his medical story without saying
5    what --
6              MR. DVORAK:  Also diabetes, that would be another one.
7              THE COURT:  But diabetes is related because we're
8    waiting for the -- so he can talk about diabetes.
9              MR. DVORAK:  Yeah, you mentioned three, but I think we
10   also -- it's really four --
11             THE COURT:  Oh, four.  I see.
12             So it's really the eyes and the stroke that seem to be
13   irrelevant.
14             MR. DVORAK:  Although aren't eyes sometimes related to
15   diabetes?
16             THE COURT:  Oh, I think they are, actually.
17             MR. DVORAK:  Yeah.
18             MS. BAUER:  But the issue is more -- zeroed in more
19   focused than that.  The issue is his blood sugar went up, and
20   that's what he was treated for.  There's no evidence that there
21   was long-term damage to his eyes.  But as far as the insulin,
22   that -- we wouldn't object to that.  I mean, that's in the
23   evidence.  But the eyes, that's a long-term issue in relation
24   to his diabetes that has nothing to do with the handcuffing or
25   his arrest in this case.

1          MR. DVORAK:  I agree.  We're not going to get into any

2     of that.  I just always am a little bit reluctant to say that

3     if a certain word comes up during trial, it's somehow extremely

4     prejudicial --

5          THE COURT:  All right.  So I'm going to -- my

6     motion -- I mean the order will be that the plaintiff shall

7     speak to his client about not going into the details of his

8     previous medical history on eyes and stroke, but those four

9     areas that I just mentioned are relevant and he can explain

10    that.  And if some small amount happens to leak out, I can deal

11    with it during the trial.

12         All right.  So the testimony and evidence on why he

13    was arrested and detained.

14         I think we already talked about this.

15         MS. KOHLS:  Yes, we did.

16         THE COURT:  So this one has been granted in part based

17    upon what I said earlier.

18         To bar evidence from speaking with any witnesses about

19    his or her trial testimony while they're under oath.

20         So my rule is that if you have the person on the

21    witness stand on direct, you can still talk to your client as

22    long as they're still on direct.  Once the person is tendered

23    for cross, then you're not allowed to talk to them about their

24    testimony.  You can talk to them about scheduling and you can

25    talk to them about lunch and whatever else you need to talk to

1    them about.  But their testimony, you're barred from doing so.

2    And I usually tell them that if we take a lunch break when

3    someone is on cross.

4         Okay.  Bar any evidence that there should have been a

5    video of this incident.

6         You know, I lived for, you know, many, many years of

7    defense attorneys saying, you know, Where's the video, Where is

8    this, and Where is that.  It's just going to simply be an

9    answer that says that there weren't -- there wasn't a video in

10   the car, I assume.  So it's not -- it doesn't go very far.  So

11   I'm not going to bar it because you can argue that, you know,

12   you're relying on the police officers, and there's no video to

13   support it because there was no video in the car.  I mean, that

14   makes sense.  You can't argue that this particular police

15   officer was obligated to have the video because it can never be

16   his obligation.  If he had one and he turned it off, it could

17   be; but if he doesn't have one, that's a city issue and it's

18   not at all -- and it's not a *Monell* charge right now, so -- you

19   see the parameters of how that can come in?

20        MR. DVORAK:  Yeah, exactly.  I just don't want to be

21   precluded from saying there was no video because then they

22   would hold it against the plaintiff saying, Oh, why isn't there

23   a video of this, why aren't you presenting a video.

24        THE COURT:  But the proper way to do that, of

25   course --

1          MS. BAUER:  We would never --

2          THE COURT:  -- that you're relying on the officers,

3     you know --

4          MR. KUTNICK:  And there's also a video camera equipped

5     in the holding room that he was held in.

6          THE COURT:  But there's no video of that.

7          MR. KUTNICK:  There's no video of that.

8          THE COURT:  Well, that's a different ballgame, though.

9     I mean, if there's video equipment and there's a reason for it

10    not being used at the time, that's relevant.  You know?  I

11    don't know why it wasn't or why it is when it is, I don't know.

12    I don't know what your evidence is.

13         MS. BAUER:  Well, then I think if it has to do with

14    the retention period, then we're going to have to have a

15    foundation witness to come in and say, Oh, well, this is the

16    retention --

17         THE COURT:  Oh, so there was a video at one point.

18         MR. KUTNICK:  I think they testified that it was not

19    activated.

20         MS. BAUER:  Oh, it wasn't activated?

21         MR. KUTNICK:  That's just my recollection of the dep

22    testimony --

23         THE COURT:  I mean, that can be relevant.  It depends

24    on what your facts are.  I don't know what your facts are.

25         MR. GREEN:  I think for non-violent felonies --

1      MR. KUTNICK:  I think that's correct, and that's what

2  they said in the rules --

3      MR. GREEN:  That's the old rules.

4      THE COURT:  You might want to do a stipulation on that

5  or just stay away from it.  Right?  It's up to you.  So it can

6  be relevant if you think that it is -- if --

7      MR. DVORAK:  Again, we may want to just bring out that

8  there was no video of this, just so the plaintiff doesn't --

9  just so the jury doesn't think that the plaintiff is

10  withholding video evidence of it, but --

11      MS. BAUER:  We would never bring that issue up.  We

12  would never cross plaintiff on why isn't there a video.

13      MR. DVORAK:  No, but, I mean, the jury might think it,

14  you know, why isn't there a video of this.  And some may assume

15  that police stations have cameras everywhere you go at all

16  times, you know, so --

17      MR. KUTNICK:  We don't want to open the door to going

18  any deeper into the underlying reason for his detention either.

19      THE COURT:  Exactly.  That's the problem if you start

20  going that route.

21      Well, you know, you can always argue in closing that

22  this isn't TV where you think everything is videotaped and

23  everything is recorded.  There's -- you know, there's -- you do

24  it like that.  Or you can just do a stipulation.  The parties

25  agree that there was no video of the incident --

1          MR. DVORAK:  We could do that.

2          THE COURT:  -- in the cell, if you want to do that.

3          MR. DVORAK:  And maybe the car at the same time.

4          THE COURT:  Okay.  We'll resolve it with a

5   stipulation.

6          Okay.  Any argument that the defendants or

7   non-defendant police officers were involved in a conspiracy to

8   violate his civil rights or to cover up a violation of his

9   civil rights.

10         You don't have a conspiracy claim.  It doesn't bar you

11  from talking about the relationship between the officers.  So

12  it's granted.

13         Okay.  So -- then we have to deal with the battery

14  issue.

15         MR. COHEN:  Your Honor, I'm sorry, could we -- could I

16  just raise one issue before we get into the city's motions *in*

17  *limine*?

18         Regarding our Number 18, which is related to

19  Plaintiff's Number 2, having to do with the reason for the

20  arrest, one of the arguments that I think plaintiff is going to

21  make is why in the world would this person sit for hours and

22  hours with all these conditions before asking to go to the

23  hospital?  He would have been asking immediately if he knew he

24  needed these medications.  And our argument is possibly going

25  to be he just didn't ask right away.  He eventually did ask;

1    and when he did ask, he was taken.

2           And I think the reason he's there -- one of the

3    arguments might be that, well, maybe he thought he was getting

4    out pretty soon and I'll just get back to my house and take my

5    medications, it's not going to be a big deal.  So if I make the

6    argument, well, maybe he just thought he was going to get out

7    soon, and then when it got later in the day and he thought

8    maybe I'm not getting out of here, I better ask to go to the

9    hospital, the jury is going to wonder, well, was he in for --

10   was he being held for murder or was it something minor?  You

11   know, I think it's relevant to explaining his frame of mind

12   because he's going to say I was asking right off the bat.  And

13   all the defendants are going to say he didn't ask until later

14   in the day.

15          THE COURT:  So you think that my ruling that he was

16   being held on felony charges that they were investigating is

17   not sufficient for that?

18          MR. COHEN:  I just think that, like, if he was being

19   held for murder, he would have no reasonable expectation he was

20   getting out this day, but in his mind this might have been

21   something he was going to get out in a few hours.

22          THE COURT:  So, yes, but what is your point then?

23          MR. COHEN:  I just think the charges -- the specific

24   reason he was arrested is helpful to explain to the jury why he

25   might have thought whether he was going to get out that day or

1    not.

2           THE COURT:  I just -- but then what are you --

3    cyber-stalking?  I mean, how would he know whether

4    cyber-stalking is going to get him out?

5           MR. COHEN:  Because in his mind, he was there because

6    he posted something he shouldn't have posted on his ex-wife's

7    Facebook or Yelp or whatever and that he probably wasn't going

8    to be there all day long.

9           THE COURT:  I don't see it.

10          Anybody else want to chime in?

11          MR. DVORAK:  I think I'm kind of along your same

12   reason, Judge.  I just don't see how this moves the ball, and

13   obviously it moves the ball toward prejudice quite a bit.

14          THE COURT:  Certainly on cross-examination you can ask

15   questions like that.  Did they tell you you were going to get

16   out in the -- they didn't tell me anything.  You know?  At what

17   point?  You know, that's all about his state of mind.  And his

18   state of mind as to whether he was going to be there all day or

19   whether he was going to go home is relevant, so his answers on

20   cross or on direct might be relevant that -- but I don't think

21   we need to bring in his cyber-stalking of his wife or ex-wife.

22   I don't see how that helps us at all.  I think it's too

23   prejudicial.  All right?

24          MR. COHEN:  Thank you.

25          THE COURT:  So I'll keep my ruling on that one.

1      Let's go now to the city.  And let's talk about

2 battery and negligence and willful misconduct, and tell me what

3 we are supposed to do with these charges.

4      MS. GOMEZ-FEIE:  So the battery claim is duplicative

5 of the excessive force claim and the *respondeat superior* claim

6 in that the only difference in the pleading is that plaintiff

7 was relying on the actions of unnamed and unknown Chicago

8 police officers who could have committed a battery.  Otherwise,

9 any type of liability is already assumed by the city through

10 *respondeat*.

11      THE COURT:  Is there still a belief on his part that

12 he doesn't know who committed the battery?  Or now we've

13 identified that person?

14      MR. DVORAK:  There's no belief on the plaintiff's

15 part.  I guess it's more of a response to any defense argument.

16 So, for example, with Campbell, the last officer I mentioned,

17 there were I think two officers who it could have been because

18 two officers were associated with that beat number.  We've

19 decided that it's Campbell.  Okay?  They may make the argument,

20 well, it could have been the other guy and he's not sued.  Or

21 they also could just think, well, I'm not sure, you know, which

22 officer actually caused the damages, there were so many people

23 on his handcuffs, it's easier just to do battery.

24      I mean, I think we have an issue with regard to if you

25 contribute to the injury, you're just as guilty as everyone

1    else.  I mean, there's that principle.  I get it.  But to a

2    jury, they might not quite get that instruction and may just

3    say, you know, it's easier to just do battery.

4            Believe me, in some ways, you know, in some ways, the

5    case is cleaner without the battery, to be honest with you.

6            MS. GOMEZ-FEIE:  Correct.

7            THE COURT:  The only time that I've kept it in in the

8    past is in two situations:

9            One, where there was a situation where the

10   defendants -- or the plaintiff didn't know which one it was, I

11   think, and so there was a concern about the -- whether it was

12   an officer or this officer or that;

13           The other was just whether the person was acting under

14   color of law at the time because it's a different standard, you

15   don't have to prove color of law for the battery.

16           So I'm going to have to take a look at your cases on

17   this one and see because I don't know.  I have to look and see

18   what you've got.

19           It seems duplicative.  In first reaction, it seems

20   duplicative to me.

21           So what is the issue then with the negligence or the

22   willful and wanton misconduct?

23           MR. GREEN:  Your Honor, these two supplemental

24   jurisdiction issues, this one, first of all, is totally

25   unrelated to the civil part of the federal claims, as you heard

1    what happened.

2          The first thing is it was a mixed claim, and now

3    they're trying to go for just negligence the way it was pled.

4          You know, the only action was they were putting -- and

5    we argue, first of all, the absolute immunity, Tort Immunity

6    Act defenses -- they were putting this gentleman, arrested on a

7    felony charge or potential felony charge, in a cage car, which

8    is essentially a mobile detention facility, and they say they

9    may not have put on the seat belt and they didn't enforce the

10   seat belt law.  That obviously is, first of all, a police

11   action.  That is absolute immunity under the Tort Immunity Act,

12   Section 9-102.  The supervision of detention facilities,

13   whether it be a mobile facility or otherwise, is also absolute

14   immunity.  These are our affirmative defenses to the actual on

15   all three.

16         But the main thing, too, is the underlying action was

17   just putting him into the car really and how they did that.  It

18   was later on, they're sitting there driving, you know, and

19   someone else, this Ms. Moore -- Morris?  She rear-ended him,

20   essentially, from another car.  These officers had nothing to

21   do with that.  The city had nothing to do with that.

22         And, in fact, the two cases that were shared with us

23   when they were deciding the negligence claim are the *Aikens*

24   case and the *Betts* case.

25         The *Aikens* case essentially says that, you know, it

1    was an Evanston police officer who was just transporting a

2    prisoner from A -- point A to point B, driving like anybody

3    else drives on the street, and caused the accident himself.  So

4    there was negligence.  He wasn't enforcing any law.  And, in

5    fact, in that case, they only used 2-202, which was enforcing

6    the law and the exception of willful and wanton.  They didn't

7    even put the absolute immunities, for whatever reason, into

8    that.  And even the Court mentioned it that they didn't argue

9    these other ones.

10            So that's one case which totally we distinguish.

11            The next one was the *Betts* case, which was very

12   similar, where an officer, he claims to have been on

13   surveillance but he was in a parked position, then he was going

14   to go join his crew.  He backs up and he hits the car behind

15   him.  I mean, totally like anybody else driving a car.  Had

16   nothing to do with enforcing.  And they said, you know, you --

17   there was no evidence that it was enforcing the law.  And,

18   again, in that case, just like the other one, they only claimed

19   2-202 as their affirmative defense.

20            Here we have a whole host, even from the original

21   complaint, of these absolute immunity defenses, plus the main

22   one was that it was caused by the act or omission of another

23   person, which obviously they've admitted it in their own

24   pleadings.

25            So we would say, first of all, that it is absolute

1   immunity on a number of counts, as well as if you decide, well,

2   maybe this was enforcing the law, as they're pleading,

3   enforcing the seat belt law, or it's under the law -- we had a

4   jury instruction about you can use a certain amount of force in

5   putting someone in a cage or handcuffing or so, in the exercise

6   of a law -- or an arrestee, that's enforcing the law, putting

7   him in, making sure he's secure for the public safety, police

8   service.  Then you have the willful and wanton, which is the

9   option.

10          But we say of course it's absolute immunity to start

11  with, or do you even exercise supplemental jurisdiction,

12  frankly, if it's not related to the federal claims.

13          Second, it's absolutely immune.

14          And, third, even under this willful and wanton claim,

15  we would argue it's far from the willful and wanton claim.

16          And we have, by the way, that written question, just

17  to focus on the willful and wanton, which is very high --

18  unlikely in this case, frankly.  We'd also like that same

19  written question if the battery comes in, too.

20          But -- so therefore, your Honor, we don't think in

21  this particular instance, with all the affirmative defenses

22  claimed as well as the unique situation of this case, that it

23  should continue.

24          THE COURT:  Do you want to go?

25          MR. DVORAK:  Okay.  Couple -- I'll try to respond to

1    that, all those points.

2          But, first of all, with regard to the supplemental

3    jurisdiction, I mean, this is completely within the whole ambit

4    of the entire day in the whole case.  I mean, so it would be to

5    basically say to the plaintiff start a brand new lawsuit in

6    state court over this distinct part of this, you know, crazy

7    day, and to think that that's not going to implicate the entire

8    day is crazy.  They'd have to start the entire case over all

9    again.  We're here, we're ready to go.  It's perfectly -- it's

10   exactly what supplemental jurisdiction is for.  Not to make a

11   fine distinction of, okay, at this point the case was over.

12   You know?

13         Second of all, the idea that this was caused by the

14   act of another, certainly the -- this is what I explained

15   before -- certainly the accident was caused by the other

16   person.  But, once again, had he been seat belted, which he had

17   no control over himself, then he would have never gotten

18   injured, at least that's our argument, because it was not some

19   high impact.  You know, fender-bender, it was just a little

20   bump and all of a sudden, boom, he goes flying, you know?  Had

21   he had the seat belt, that would have never happened.

22         I mean, they can try to argue contributory negligence

23   or whatever they want, but I don't think that's a complete

24   basis for not having liability.

25         Regarding the *Aikens* -- well, the *Aikens* case.

1          THE COURT:  How do you just separate it -- he's a

2     police officer being negligent in your opinion --

3          (Recess taken for fire alarm from 12:17 p.m. to 12:44 p.m.)

4          (Off-the-record discussion.)

5          THE COURT:  As I was saying before, the only two times

6     I've left a battery in that when it wasn't duplicative was:

7     Number one, when there was a question of who; and, number two,

8     when there was an issue regarding color of law.

9          But if you know who and you have color of law, then it

10    is duplicative and it should not be -- it should not go

11    forward, leaving the city only in on the negligence claim.

12    Okay?

13         MR. GREEN:  I'm sorry, are you ruling that it's

14    negligence and not willful and wanton?

15         THE COURT:  No --

16         MR. DVORAK:  I think I was in the middle of argument

17    that --

18         THE COURT:  Just battery.  Just the battery.

19         And then you want to respond to the --

20         MR. DVORAK:  Yeah, I think I forgot where I left off.

21         THE COURT:  I did, too.  So much has happened.

22         MR. DVORAK:  But I -- let me -- I believe I already

23    talked about the supplemental jurisdiction and about the other

24    person causing the accident.  Okay.

25         I guess here's -- first of all, I think what your

1    Honor should know is that we're claiming negligence, but

2    alternatively we also have a willful and wanton claim.  So if

3    your Honor believes -- the only thing that I guess would

4    dismiss it is if it's absolute immunity, okay?  And I'm not

5    exactly sure what the city is talking about as far as enforcing

6    the law part of it.  But as far as the absolute immunity for

7    transporting prisoners aspect, which was not argued in those

8    motions, this is not related to that.  This is a distinct act

9    that's not related to the transportation in a vehicle, and

10   that's what the cases talked about is the act is simply putting

11   on a seat belt or not putting on a seat belt, and that would I

12   think, by the way, constitute negligence or willful and wanton,

13   because I think if you just think about it, I know Mr. Macaluso

14   is not a child, but he has no ability to put it on himself.

15           THE COURT:  Yes, right.

16           MR. DVORAK:  If this was a child --

17           THE COURT:  But it's more willful and wanton because

18   the person is restrained is your point, being that he's at a

19   higher risk of being injured --

20           MR. DVORAK:  Exactly.

21           THE COURT:  -- because he's restrained behind his back

22   and, therefore, has no ability to correct himself within the

23   back of the car.

24           MR. DVORAK:  Exactly.  Exactly.  So I do believe it

25   does fall within the ambit of negligence, but the alternative

1    would be, you know, willful and wanton in the sense that I

2    think it would rise to the level of willful and wanton, and I

3    don't think it's absolute immunity.

4            MR. KUTNICK:  He's unable to seat belt himself --

5            THE COURT:  Yes, right.

6            MR. KUTNICK:  -- and he's also unable, as you said,

7    your Honor, to brace himself.

8            THE COURT:  That's the big thing, yes.  And so what

9    happened in those cases, what do they charge in those cases

10    where they're like in the police wagons and they're not

11    restrained, and then there's -- what --

12            MR. KUTNICK:  There was a death in Baltimore.

13            THE COURT:  Yes, right --

14            MR. KUTNICK:  Freddie Gray or something --

15            THE COURT:  Yes, right.  I don't know.

16            MR. KUTNICK:  I don't remember.

17            THE COURT:  I don't know enough on the law on this to

18    rule, and I'd have to go and read the law.  But my gut, based

19    upon everything that's being argued -- if that matters, my

20    gut -- is that it would lead to willful and wanton and not

21    negligence because negligence would result in immunity, and so

22    you'd have to allege a willful and wanton conduct, and it could

23    arise to willful and wanton if someone is not capable of

24    preventing himself from moving around in a vehicle when he's

25    restrained behind his back.  Because those are the facts,

1   right?  He's restrained behind his back.

2           MR. DVORAK:  I believe so.

3           MR. COHEN:  It's not --

4           MR. DVORAK:  I'm not sure if it matters --

5           MR. COHEN:  He still wouldn't be able to -- even if

6   it's in the front, he still wouldn't be able to put it on

7   himself.

8           THE COURT:  That's true, too.  Yes, that's true, too.

9   Even if it's in his front, he wouldn't be able to put it on

10  himself.

11          That's my inclination, but I'll take a look at it.

12  I'll look at the cases that you cited, and we'll go from there.

13          All right.  Is that the end of your motions *in limine*?

14          MS. KOHLS:  Yes.

15          MR. GREEN:  I believe for the city, yes.

16          THE COURT:  No, for everyone.

17          So let's take a look at your jury instructions now.

18  And you should have given -- no, I didn't give you the rule.

19  That's -- it was Judge Gottschall's.  I have a specific

20  procedure for doing this.

21          So let's start with the ones that I assume that you're

22  not going to have an objection with.  And that is 1.01, the

23  functions of the jury.

24          I'm going to just go through them unless someone says

25  to me that they have an objection.

1           That will be given.

2           1.02 is under advisement for whether I actually ask a

3   witness a question.  I doubt I will.

4           1.04 is the evidence consisting of testimony and

5   stipulations.  It will be given.  I doubt that I will have

6   judicial notice of certain facts, so we'll take that part under

7   advisement.

8           Deposition as substantive evidence.  I will give that

9   based upon the fact that you are going to tell me which

10  witnesses are testifying by way of deposition.  I will need the

11  names and the dates for that.

12          Deposition to be read aloud.  Are you doing that?

13  Anybody?

14          MR. COHEN:  One of them --

15          MR. DVORAK:  You are, right.

16          MS. BAUER:  Yes, we are.

17          THE COURT:  I will give that.

18          Video deposition testimony.  I will give that.

19          Judge's comments to lawyers.  There should never be a

20  reason for me to give this because you're all going to be very

21  well-behaved.

22          I started a rule the day I became a judge, which was

23  if you do something that is inappropriate in front of the jury,

24  I have a sidebar and I tell you don't do that again.  And then

25  if you do it again, then I will say, you know, Mr. so-and-so,

1   we had a sidebar regarding something, and I'll refer to very

2   nebulously.  And then the third strike is in front of the jury,

3   the correction.  No one has ever gone to the third strike in

4   all the years I've been on the bench.  So I always give you a

5   warning if something that you're doing isn't appropriate, but

6   it's never in front of the jury.

7         All right.  What is not evidence is fine.  That should

8   be given.

9         Note-taking shall be given.

10         Consideration of all evidence, regardless of who

11   produced it, should be given.

12         Limited purpose of evidence will be taken under

13   advisement in case I make such a ruling.

14         Weighing the evidence should be given.

15         Direct and circumstantial shall be given.

16         Testimony of witnesses shall be given.

17         Lawyer interviewing a witness shall be given.

18         Stipulated testimony.  I think we're going to have

19   one.  Right?

20         MR. COHEN:  Probably.

21         MS. KOHLS:  Yes.

22         THE COURT:  It's not stipulated testimony.  It's just

23   a stipulation.  I don't know if you're going to have --

24         MS. KOHLS:  We actually may also have stipulated

25   testimony.  We're working that out right now.

1          MR. DVORAK:  With the medical records -- I mean
2    medical bills.
3          MS. KOHLS:  Mabery.
4          MR. COHEN:  This is just stipulated testimony.
5          THE COURT:  This is testimony?
6          MR. COHEN:  We may have that as well.
7          THE COURT:  So it will be under advisement, depending
8    on if you get it for me.
9          And then stipulations, that will be under advisement
10   if you give it to me.
11         Prior inconsistent statements.  I assume we'll have
12   something so that we have talented lawyers who are going to
13   show me how to cross, so I'm going to probably give that.
14         Absence of evidence is a good one to be given.
15         Demonstrative exhibits.  I assume you're going to have
16   some.  Anybody?
17         MS. KOHLS:  Probably.
18         MR. DVORAK:  I think so, but --
19         THE COURT:  All right.  Well, we'll just keep it in
20   there for now.
21         MR. DVORAK:  I can't think of one off my head.
22         THE COURT:  Expert witness we keep in.
23         Burden of proof we keep in.
24         Claims.  Plaintiff objects -- willful and wanton
25   language included here.  His position is that the negligence

1    standard applies.

2          Okay.  Well, I took that under advisement with the

3    preview of coming attractions that I think it is willful and

4    wanton, but I'll make that a definitive ruling when I read your

5    cases.

6          MS. KOHLS:  Battery is gone now, too.

7          THE COURT:  And battery comes out.

8          Fourth Amendment, medical care for arrestee.  Any

9    objection to that one?

10         MS. BAUER:  That one is agreed.

11         THE COURT:  Okay.  So that will be given.

12         Selection of presiding juror will be given.

13         Unanimous verdict will be given.

14         Communication with Court will be given.

15         Okay.  Now let's get into the Fourth Amendment

16   excessive force ones.

17         So the defendants are objecting as it's not complete.

18   And what is missing?

19         MS. BAUER:  There's a little bit -- it may not be

20   specifically listed in there; but in relation to that, I think

21   it's not necessarily just the standard for excessive force.

22   And this is actually a copy of the Seventh Circuit -- do you

23   have those?  The regular one?

24         THE COURT:  Yes.

25         MS. BAUER:  And it doesn't separate out the claims

1    here.  So we have within this instruction that, even though

2    it's an excessive force instruction, that plaintiff is asking

3    for "used excessive force against him or failed to intervene to

4    prevent the plaintiff from being subjected to excessive force,"

5    so that's simply not the standard of what excessive force is.

6    That's a failure to intervene claim.

7            MR. DVORAK:  We agree.  I don't know -- we must have

8    missed that.

9            THE COURT:  Yes.

10           MR. DVORAK:  We agree to that.  We can strike that

11   language.

12           THE COURT:  So, yeah, so it's just "used excessive

13   force against him," period.

14           And then you're going to exclude "or failed to

15   intervene to prevent plaintiff from being subjected to

16   excessive force."

17           And then "to succeed on this claim" is the proper

18   language.

19           And no need to repeat it.

20           "Plaintiff must prove each of the following by a

21   preponderance of the evidence."

22           So I'm going to use -- I'm going to use the standard

23   instruction that "defendants used unreasonable force," and

24   that's it.

25           Then the next thing is whether they acted under color

113

 1    of law.  And I think you're all agreeing, correct?

 2              MR. DVORAK:  That's not an issue in the case.

 3              THE COURT:  So what I usually do is I use the correct

 4    instruction, which would say that the defendant used

 5    unreasonable force and defendant acted under color of law, and

 6    then the next instruction is that the parties do not dispute

 7    that the -- that defendants Tracy, Munizzi, Blourn, Alegre, and

 8    Campbell were acting under color of law.  Okay?

 9              And then you don't do that the plaintiff was harmed.

10    That's improper.

11              You just have just the unreasonable force and under

12    color of law.

13              So I'm going to do the standard.

14              MS. BAUER:  That's also what our proposed is.  It went

15    off the standard.

16              THE COURT:  Okay.  So it's the standard that's going

17    to be used.  Okay?

18              MR. DVORAK:  By the way, do you want us to make these

19    changes and send them to you --

20              THE COURT:  No, I'm going to make these.  You're going

21    to email my law clerk the Word version of these.

22              So the next one is 7 -- it's actually 7.10.

23              MS. BAUER:  Yeah.  And our objection to this one is it

24    doesn't fully instruct the jury on how to analyze the use of

25    force as the Seventh Circuit model instruction demonstrates.

1    Specifically, it doesn't have the second paragraph, second

2    sentence, "circumstances you may consider the need for use of

3    force." And that's how -- that's telling the jury how to look

4    at this use of force.

5            THE COURT: Yes, I agree. And that is very helpful to

6    them.

7            And the third paragraph in 7.10 isn't, because it's

8    deadly.

9            And then the fourth paragraph is critical about

10   whether or not you're deciding from the perspective of a

11   reasonable officer facing the same circumstances.

12           So 7.1 will be given -- I mean 7.10 will be given,

13   paragraphs 1, 2, and 4, not third paragraph, and the bracketed

14   language in the second paragraph will be given.

15           Failure to intervene. Who is failing to intervene in

16   this case?

17           MR. DVORAK: Well, your Honor, this is sort of a --

18   central to I think a lot of the objections on the failure to

19   intervene.

20           There was a case called *Sanchez* that we actually cited

21   in the objection to the defendants' proposed instruction -- but

22   it would apply to this one as well -- that says you don't have

23   to prove the name of the officer who didn't intervene, you just

24   have to prove that he was a police officer.

25           So, in other words, we don't have to say that Smith

1    didn't intervene when Jones used excessive force.

2              And it's important in this case because we essentially

3    have two sets of officers in one handcuffing, two sets of

4    officers in another handcuffing --

5              THE COURT:  But you didn't charge it.

6              MR. DVORAK:  I'm sorry?

7              THE COURT:  You didn't charge failure to intervene

8    against specific officers?

9              MR. DVORAK:  We did, we did.

10             THE COURT:  Oh.  But specifically saying which one did

11   it?

12             MR. DVORAK:  No.  We're saying that they all either

13   used excessive force or failed to intervene to use excessive

14   force.

15             MR. COHEN:  Your Honor, the way the complaint -- I'm

16   sorry.

17             MR. DVORAK:  Oh.  Basically, the way it goes is this,

18   is -- let's just take the first two officers, Tracy and

19   Munizzi.

20             The plaintiff had his back, you know, to them when he

21   was being cuffed, so he doesn't know which one put the cuffs

22   on, and the defendants don't admit that either.  So for us it

23   is if -- either the person either put on the cuffs -- I mean,

24   circumstantially they can figure out which one did it, or if

25   they're not sure which one did it, then it would be failure to

116

1    intervene.  They would have been there when it was happening

2    and they did nothing.  And also failure to intervene is a

3    little bit broader because it would be -- it's still continuing

4    to hurt you, you're still having a lot of pain, and you're not

5    doing anything about it.  Do you know what I'm saying?

6          THE COURT:  So did you charge -- each of the

7    individual officers that you charged with excessive force, did

8    you charge them with failing to intervene?

9          MR. DVORAK:  Yes.

10          THE COURT:  Okay.  That's a fair theory of liability.

11   You can do that.

12          MR. DVORAK:  Okay.

13          THE COURT:  So then, though, this failure to intervene

14   instruction has to be written differently.  It has to be

15   written such that it says to succeed on his failure to

16   intervene claim against, and it recites the officers' names

17   again, the same ones that are in your excessive force claim --

18          MR. DVORAK:  Okay.

19          THE COURT:  -- you must prove each of the following

20   things.

21          And so let's just take a look now at the actual

22   substance of it.

23          Again, I'll be using the standard instruction in

24   significant part because I worked on the Jury Instruction

25   Committee that worked on them, and I think they're good.

1               So we'll use the 7.22.

2               And do you see how it says, "Name of officer alleged

3     to have committed"?

4               Now, what we'll say there is -- we're probably going

5     to have to say -- this is interesting.  How could I do that?

6               MR. DVORAK:  Well --

7               THE COURT:  I don't want to do a separate instruction

8     for each and every one, do I?

9               MR. DVORAK:  I don't think you have to name the

10    officer is the way that -- that's what the *Sanchez* case --

11              THE COURT:  We definitely need to name the officers

12    who can be liable under it.

13              MR. DVORAK:  Sure.

14              THE COURT:  So then you would have to say that --

15              MS. BAUER:  What we could do is do an and/or.

16              The defendants proposed one with the individual

17    officers, according to the model instructions.  And then the

18    verdict form does have the individual officers listed out, like

19    do you find them liable for failure to intervene --

20              THE COURT:  Yes.

21              MS. BAUER:  -- so they do have to take that into

22    consideration.

23              Is that what you're referring to, your Honor?

24              THE COURT:  Yes.  Can I take a look at how you did

25    that?

1        MS. BAUER:  Sure.

2        THE COURT:  I mean, I've got it in mine, too, but

3    you've got it open, so ...

4        (Tendered.)

5        (Counsel conferring.)

6        THE COURT:  See, I think one of the problems with the

7    way you have it is that you have them collectively using

8    excessive force.

9        MS. BAUER:  Yeah, I didn't put in the "or" part.

10       THE COURT:  Yes, okay.  So it would have to be

11   Officers Munizzi and/or Tracy and/or Alegre and/or Blourn

12   and/or Campbell used excessive force on plaintiff, and

13   defendant knew that -- the defendant that you are

14   considering --

15       MS. BAUER:  Okay.

16       THE COURT:  -- knew that Officer Munizzi and/or Tracy

17   and/or Alegre and/or Blourn and/or Campbell was using excessive

18   force or was about to use excessive force.

19       MS. BAUER:  Okay.

20       THE COURT:  I think that's the way that has to be

21   written.

22       MS. BAUER:  We also have an instruction in relation --

23   that's disputed in relation to personal involvement, and I

24   think that could also help.  Maybe we can get them closer

25   together so the jury would hear you can only find them liable

1    for their aspect of it.

2           THE COURT:  Yeah, yeah.

3           MR. DVORAK:  Judge, that's where *Sanchez* comes in.

4    And *Sanchez* specifically says that confuses the jury because

5    that implies that you -- it sort of almost negates the failure

6    to intervene because you're saying that you have to show

7    they're personally involved in the misconduct, which implies

8    that you have to personally be --

9           THE COURT:  And where is your *Sanchez* cite?  Are you

10   in -- is it in your --

11          MR. DVORAK:  It's cited in their -- objection to their

12   instruction.

13          THE COURT:  Okay.

14          MR. BLEIFUSS:  Page 36.

15          THE COURT:  Okay.  I break them apart, so ...

16          MR. DVORAK:  *Sanchez versus City of Chicago*.

17          LAW CLERK:  Judge, it's -- oh, you've got it.

18          THE COURT:  Yes.

19          MS. BAUER:  But that seems to refer to whether the

20   plaintiff cannot identify the person.

21          THE COURT:  You don't have that one, do you?

22          LAW CLERK:  I do.

23          THE COURT:  Thank you.

24          MS. BAUER:  Yeah, I think that's just -- you can be

25   found liable for failing to intervene on something even though

1    you don't know who did it.  That's how I read *Sanchez*.

2          MR. DVORAK:  Well, that's part of *Sanchez*, certainly;

3    but they also talk about the instructions.

4          Yeah, it's the paragraph that begins "Second."  It's

5    the final jury instruction.  Do we have that case?

6          THE COURT:  I do.

7          MR. DVORAK:  Okay.  It says, "The final jury

8    instruction as to *Sanchez* failure to intervene theory gave the

9    jury the mistaken impression that neither Caballero or Peterson

10   could be held liable under federal law for failing to intervene

11   in the use of excessive force by another officer unless one or

12   more of these named officers himself participated in the use of

13   such force."

14         THE COURT:  Where are you reading?

15         MR. KUTNICK:  Page 12 to 13, Judge.

16         THE COURT:  Page 12?

17         MR. DVORAK:  Well, 12 or 13 of the Lexis --

18         MR. KUTNICK:  Of the Lexis cite.

19         MR. DVORAK:  925 -- it starts with the paragraph

20   "Second."

21         THE COURT:  I have no idea where you are.

22         MR. DVORAK:  Oh.  So it's page 925.  And the paragraph

23   starts, "Second, comma, the final jury instruction as to

24   *Sanchez*'s failure to intervene."

25         THE COURT:  Okay.

1          (Pause in proceedings.)

2          THE COURT:  Yes, but I think I've corrected this

3     problem.  See, because the *Sanchez* problem was that the

4     instruction foreclosed the possibility of holding Caballero and

5     Peterson liable for failing to intervene in the wrongdoing of

6     other unnamed officers, but I'm naming all of the officers that

7     you have charged with excessive force, so long as neither of

8     them participated in that wrongdoing, so indeed nowhere in the

9     instruction are the unnamed officers even mentioned.  The

10    language we have quoted refers instead to the failure to

11    intervene in the wrongdoing of another defendant.

12         But I think by doing it the way I just said, it's

13    going to have the world view of the four or five officers

14    you've charged, these are the ones that used excessive force,

15    and that officer you're considering then has to determine

16    whether they failed to intervene with one or more than one

17    using excessive force.

18         MR. DVORAK:  First of all, too, I should have said

19    this before, it can't be -- it's not necessarily just that the

20    officers didn't failure to intervene for the named defendants,

21    because, remember, there's a not named officer who was partners

22    with Campbell who was part of that team that went to the

23    hospital.

24         THE COURT:  Oh, I see.

25         MR. DVORAK:  And we're contending certainly that it

1    was Campbell who put the cuffs on; but if for some reason, I
2    think if the jury thought, no, it was the other partner, if the
3    defendants argue that, you know, then I think it opens the door
4    to the instruction saying that it could have been him and he
5    failed to intervene him.  But I -- maybe that would depend more
6    if the defendants made that argument.  I don't know.
7            THE COURT:  So wouldn't it be corrected then if we
8    added "and an unknown officer"?
9            MR. DVORAK:  Yeah, I think that's fine, too.  Or "any
10   unknown officer."
11           THE COURT:  "An."  There's only one, right?  "An
12   unknown officer."
13           MR. DVORAK:  That's fine.
14           THE COURT:  So we'll name everyone "and an unknown
15   officer."
16           MR. DVORAK:  Although we know his name.
17           THE COURT:  Yes, I mean, you're going to argue that.
18   Well, let's see how it plays out.  But I think that corrects
19   it, doesn't it?
20           MR. DVORAK:  Well, yeah, I wasn't having any problem
21   with the instruction itself.
22           I guess we were dovetailing into the instruction that
23   the defendants proposed, which was the personal involvement
24   instruction I think confuses things.
25           THE COURT:  Oh, okay.

1          MR. DVORAK:  But we can wait to get there, if you

2     want.

3          THE COURT:  Okay.  I can see your issue there.

4          Okay.  All right.  Let's -- I will get that one

5     cleaned up then.

6          Am I at the right place?  Where was I?  Did I leave

7     off -- yes, I should be on negligence, which I'm taking under

8     advisement and probably not giving.

9          Proximate cause.  Only if negligence is in.  So that's

10    under advisement.

11         MR. DVORAK:  Your Honor, is that necessarily true --

12         THE COURT:  Oh, no, I guess proximate cause could be

13    in your damages.  It could be your injuries.

14         MR. DVORAK:  Yeah, exactly.

15         MR. GREEN:  Your Honor, I -- we actually have a

16    supplemental city proximately cause instruction which we added

17    at the same time, but apparently the I.P.I., they re -- or they

18    changed it a couple years ago, so this is actually what's in

19    the I.P.I., but the last line, it is sufficient -- it is

20    sufficient if it combines with another cause resulting in

21    injury is not required -- and we would like it in this one.

22         THE COURT:  Why are we using the I.P.I.'s version?

23         MR. GREEN:  Because, actually, in the federal -- I

24    don't think they have --

25         THE COURT:  We don't have one?

1           MR. GREEN:  Right.  They say it's pretty much

2    case-by-case basis.

3           THE COURT:  Got it.  Okay.

4           MR. GREEN:  And the I.P.I. has a very simple one that

5    stops just before "it is sufficient."  You know, it stops at

6    "or nearest cause."

7           And I do admit this is the latest language, but that

8    second sentence is totally optional -- or third sentence, I

9    should say.

10         THE COURT:  So what is your proposal in yours?

11         MR. GREEN:  Just to drop the last sentence, because we

12    do have a lone proximate cause instruction that we proposed,

13    too, sole proximate cause, of the other driver.

14         MR. DVORAK:  Your Honor, I think that's hugely

15    problematic for us in this case, and I'll tell you why.

16         So, for example, with the handcuffing, what we have

17    here are five individuals who we're saying all used excessive

18    force in some ways or failure to intervene and contributed to

19    the damage to his wrists.

20         I don't think anyone can necessarily say this all was

21    a result of the first officers or the second officers or the

22    last officers.  But under the proximately caused theory, there

23    can be more than one proximate cause, there can be multiple

24    proximate causes, and it can be sufficient if you combine the

25    last language.  It is sufficient if it combines with other

1    cause.

2         So I think that's critical because I don't think we're

3    ever going to be able to prove that this one particular officer

4    caused the surgery.  I think they all did by doing that.

5         MR. GREEN:  I see.  So you're saying this would be for

6    the federal claims, but I'm just arguing for the state --

7    purpose of the state court claim or state law claim, that

8    second sentence is not required.

9         THE COURT:  Well, we can't separate them out.

10        MR. DVORAK:  And not to mention I think it could be

11   both because, to some degree, yeah, the person who hit the car

12   is partly at fault.  This wouldn't have happened but for her

13   doing that.  But at the same time, the officers are at fault by

14   not putting him in the seat belt.  So I think that applies to

15   both of those.

16        THE COURT:  I think both of them apply, so I'm not

17   excluding the second line of proximate cause.

18        Aggravation of pre-existing injury.  Is this -- which

19   of the many injuries are we saying is pre-existing?  All of the

20   above?

21        MR. DVORAK:  Well, the pre-existing would obviously be

22   with regard to the handcuffing and the defendants' theory of

23   the case.

24        The defendants' theory of the case is that someone

25   with diabetes is more susceptible to a handcuff injury.  And,

1   you know, Dr. Urbanosky agrees with that.  But that should not

2   be a basis for denying liability, the fact that there's a

3   pre-existing condition.  I think that's kind of just standard

4   tort law, and that's why I think it should apply.

5            THE COURT:  Are you just saying that it should not be

6   given, defendants, or have you given a different version?

7            MS. BAUER:  No, we're not saying it shouldn't be

8   given.  We're just giving a different version that was crafted

9   by Judge Chang that we feel like is more informative --

10           THE COURT:  But I don't have it.  Where is it?

11           MS. BAUER:  That's in defendants' page 42 of the

12  pretrial -- or 41 of the pretrial order.

13           THE COURT:  I don't have it -- it's in the damages --

14           LAW CLERK:  I'm sorry, no.  (Indicating.)

15           THE COURT:  Well, I like the language, but it's not

16  just from failing to seat belt him.  Right?

17           Oh, I see.  You've got them all -- you've got them all

18  broken down.  Yeah.

19           Do you object to this one?

20           MR. DVORAK:  Well, yes, because I think the key

21  difference -- and I could be wrong, the way I compare the

22  two -- is that it indicates that -- I'm trying to see where the

23  sentence starts.  This is like some big run-on, so -- the part

24  that says plaintiff -- "and that plaintiff suffered damages

25  that were greater than what would otherwise normally be

1    expected because of pre-existing physical condition."

2           I tend to think that that puts some sort of added

3    burden on us than the normal just straight tort would require,

4    and it's kind of confusing about that they were greater than

5    what would have happened.  That's pretty confusing.  And I

6    don't think just the standard aggravation of pre-existing

7    condition instruction requires that.  I don't think the case

8    law requires that.

9           MS. BAUER:  But it does because the definition of a

10   pre-existing condition -- we're not responsible for the fact

11   that he had diabetes or a kidney replacement.  What we're

12   responsible for is the damages that resulted as relation to,

13   that you're alleging, in relation to defendants' conduct, and

14   he was more susceptible to being harmed by that conduct because

15   of pre-existing conditions, so that is your burden to prove

16   that we're not responsible for the diabetes, that because he

17   had that, he was more susceptible to the damages that were done

18   in this case, so that is your burden.  And Judge Chang's

19   instruction explains that to the jury, and he explain what a

20   pre-existing condition is so that they even know what

21   they're -- what they're looking at.

22          MR. DVORAK:  But I think what that does, though, is --

23   I think the only thing a jury should be told is that you can't

24   deny someone, you know, damages because of that pre-existing

25   condition.  I don't think it requires some sort of added burden

1    to saying it would have been greater had -- because of this.

2    The "greater" language to me is problematic.  I don't know what

3    that means, greater than -- than what?  And I think it's just

4    very confusing as to --

5            THE COURT:  Well, it says what it is.  It's greater

6    than what would normally be expected.

7            MS. BAUER:  Like, we're not -- defendants aren't

8    responsible for the fact that plaintiff is already damaged.

9    We're responsible for any issues that arose of how we treated

10   him in relation to those damages.  That's what that's saying.

11   And that's what we can only be responsible for under the law.

12           MR. DVORAK:  I'm not sure how a jury is going to

13   understand this.  I mean, what would normally be expected?  I

14   mean, how are we going to say what would normally be expected,

15   you know?

16           THE COURT:  I'll take a look at it.

17           Battery is out.

18           Damages -- did you -- why are the page numbers

19   different than the final pretrial order so that we can

20   reference the same thing?  Are they preprinted?

21           LAW CLERK:  I put them in Word format so I can change

22   them going forward.

23           THE COURT:  Oh, I see.

24           Where is the -- where is the defendants' jury

25   instruction Number 20?

1          MS. BAUER:  42 of --

2          THE COURT:  That doesn't help me.

3          MS. KOHLS:  I have a copy, if you would like to look

4    at it.

5          MS. BAUER:  We have an extra binder, your Honor.  So

6    it would be page 42.

7          THE COURT:  That's not what you proposed.  You said

8    Number 20.  Jury Instruction Number 20.  Is that your Jury

9    Instruction Number 20?  It says Number 11.

10         You're objecting to the plaintiff's saying defendants'

11   proposed Jury Instruction 20.

12         MR. BLEIFUSS:  That may have been a drafting error on

13   plaintiff's part because we -- as we were dividing the

14   instructions between agreed and --

15         THE COURT:  Okay.  What's the objection?

16         MS. BAUER:  So our -- yeah, that -- we originally had

17   20 and then it was joined together, so that's just a mistake.

18         But the damages instructions were -- that plaintiff is

19   proposing, we are just saying that that is duplicative of the

20   instructions on compensatory damages, and that's just

21   unnecessary.  And so what we're just saying is we just want one

22   instruction, which is 7.26, the damages.

23         THE COURT:  We always give a single instruction that

24   says that they don't have to go to that big instruction if

25   they're not entitled.  You just don't consider.  There's no

 1    reason to object to plaintiff's proposed Number 8.  I mean,

 2    normally you like that one.  Right?  8 is in.  Plaintiff's

 3    proposed 8 is in.  It's not duplicative.  So that's overruled.

 4          Compensatory damages.  I'll be using the pattern --

 5    and not Illinois' pattern, my pattern, the Seventh Circuit

 6    pattern 7.23.

 7          So what do the two of you object to with 7.23?  If

 8    anything.

 9          MR. GREEN:  The city has an additional damages-related

10    instruction, but that doesn't affect the underlying

11    instruction.

12          THE COURT:  That's not helpful.  Tell me what you're

13    talking about.

14          What is your additional language?  What's not included

15    in the pattern that you think needs to be included in the

16    pattern and why?

17          MR. GREEN:  Right.  It's the city's supplemental

18    proposed instruction Number 5.  It's simply the damages for

19    more than one injury, you can't award further damages for more

20    than -- once for the same injury because in this particular

21    case we have three separated injuries, and we just wanted to

22    put that protective language in there.

23          THE COURT:  I don't -- I don't mind that, but that's a

24    separate instruction.  Is that what you're saying?

25          MR. GREEN:  Yes.

1      THE COURT:  Yes.  It would be separate.

2      MR. DVORAK:  Your Honor, I just noticed a scrivener's

3  error.  We cut and paste this from a prior case where

4  attorney's fees were at issue, and I just noticed that Number 1

5  has attorney's fees, so that should be stricken.

6      THE COURT:  I'm going to use the standard instruction

7  I'll say for the third time.  So if you have something

8  different that you want to add to the standard instruction,

9  then you should speak now.  Anybody?

10     MR. DVORAK:  I guess I'm confused.

11     Doesn't the pattern instruction say that only the

12  damages at issue should be stated?

13     THE COURT:  Doesn't say anything about damages at

14  issue.

15     It says 7.22 or -- what is it?

16     MS. KOHLS:  7.23.

17     THE COURT:  I didn't hear you.

18     MS. BAUER:  I thought it was 7.26.

19     MR. COHEN:  That's just the standard --

20     MS. BAUER:  Ours is the standard, and we just -- we

21  took out damages that were not relevant to this case.

22     THE COURT:  You have to read it if you -- do you have

23  your jury instruction book with you?

24     MR. DVORAK:  We have it online.

25     Yeah, it sets out the types of damages that are at

1    issue.  And we're just saying that that was an error.  We

2    didn't mean to put in that attorney's fees were at issue.  It

3    was from a prior case, and we tucked it in on accident.

4         MS. BAUER:  Okay.  The other issue I think is the

5    disability aspect of it.  I think we took out the disability

6    aspect of it as well because you dropped the ADA claim.

7         MR. DVORAK:  I would disagree with that because

8    disability doesn't mean disability per ADA.  Disability just

9    means how that's defined as far as damages.

10        MS. BAUER:  Yeah, but --

11        THE COURT:  He's not disabled in any way from the

12   injuries.

13        MR. DVORAK:  Handcuffing I would argue that he was.  I

14   mean, he does have some sort of permanency involved in that.

15        THE COURT:  I won't put disability in.

16        I'll do the instruction and send it off to you, and

17   you can object to it if you want.

18        The multiple claims and multiple defendants

19   instruction 1.25 must be given.

20        Why would you object to the other one if you are

21   keeping this one in?  1.31.

22        MS. BAUER:  That's just referring to defendants', your

23   Honor.  We can keep in the plaintiff's.  That's fine.

24        THE COURT:  Okay.  Well, I don't know why you would

25   object to it.

1      All right.  The personal involvement instruction is
2  the one that you're saying is for failure to intervene is a
3  problem?
4           MR. DVORAK:  Yes.  Correct, Judge.  We didn't -- yeah.
5           MS. BAUER:  And it's in relation to the excessive
6  force and the failure to intervene because the way plaintiff
7  has kind of pled these is looping the two together, and that's
8  simply not the standard of the law.  Like each individual
9  officer needs to be considered for the alleged damages and
10  so --
11           THE COURT:  Yes.  Well, I can put another line in this
12  on the failure to intervene, and I'll send it to you and you
13  can see if you disagree with it.
14           MS. BAUER:  Okay.
15           THE COURT:  Fourth Amendment -- so I'll take into
16  account the willful and wanton based upon my review of that
17  case law.
18           And I think damages for more than one injury is
19  appropriate in this case.  And it shouldn't conflict with the
20  defendants' proposed jury form, because if it does, then the
21  verdict form is wrong.  So I'll take a look at the verdict
22  form.
23           MR. GREEN:  We have the city proposed verdict form,
24  which I believe separated it out a little better, and made sure
25  there was no double -- it had three separate lines for the

1    three distinct types of injuries.

2           There was one correction that we talked to plaintiffs

3    about, instead of -- when we divided up for the state law

4    damages purposes, there's different law regarding the

5    medical-related -- medical and medical-related damages versus

6    we have other damages.  We'd just like to repeat non-medical or

7    non-medical-related damages, to clarify it.  That's just some

8    language.

9           And we, of course, we have our written question

10   testing the willful and wanton.

11          MR. DVORAK:  I think the big issue we had with the

12   defendants' version -- I mean, obviously they separate it out

13   by claim; we separate it out by plaintiff versus particular

14   defendant.  I don't know if I have a particular preference one

15   way or the other.  I'll leave that up to your Honor.

16          But I think in this case, it's -- I guess I'd have a

17   problem with separating out the damages per claim.  I don't

18   think that's supposed to happen.  I know sometimes plaintiffs

19   try to do that.  But I think it would be confusing in this

20   case.

21          MR. GREEN:  Actually, we addressed that in the city's

22   proposed one, I believe.

23          MR. DVORAK:  Oh.

24          MR. GREEN:  We have three separate -- we named the

25   claims that would relate to each of the three damages in the

1    proposed one.  We have A, B, and C for the compensatory

2    damages.

3           The first one would be particularly to the denial of

4    medical care claim, one-liner.

5           The next one would be the excessive force, failure to

6    intervene, you can knock out battery.  That's a one-liner.

7           And then C, because of the unique nature of the city

8    claim, if it was to just remain willful and wanton, we knock

9    out negligence.  And instead of other damages, we say

10    non-medical and non-medical-related damages.  Then that totals

11    just for that one claim, and then there's the proportion of

12    fault.  That's tested under Illinois law.  And then we had the

13    overall total at the very bottom for all three.

14           It's a little complicated, but I think that's --

15           THE COURT:  But I don't need proportion of fault

16    unless negligence is in, I thought.  No?  Right?

17           MR. GREEN:  I think to the extent that willful and

18    wanton is a form of negligence, I think it would still apply.

19           MR. COHEN:  Case law defines willful and wanton

20    conduct as -- it's just an aggravated form of negligence under

21    the state -- the state case law.

22           MR. GREEN:  So I think we would still -- we can look

23    into it further, just in case; but I believe, for the purposes

24    of damages, it would still be apportionment of fault.  Just the

25    standard -- it's actually willful and wanton is the -- let's

1    put it this way.  The city's actually absolute immunity in this

2    particular situation under 2-202, the exception and the burden

3    of proof is on the plaintiff to prove, well, wait a minute,

4    they should be held liable on a willful and wanton standard.

5    And if they are, then you can apportion it.

6         THE COURT:  So what are they going to be told about

7    Ms. Morris?

8         MR. GREEN:  Well, that's -- there's testimony of they

9    got rear-ended, the car -- it wouldn't necessarily be her name,

10   but maybe the other -- the other defendant, because we also

11   have the jury instruction about the sole proximate cause.

12        THE COURT:  So I'm going to need you to give me a

13   brief or something on this apportionment of damages under the

14   willful and wanton because I'm not familiar with it.

15        Shows you that we don't do a lot of state court

16   negligence cases.

17        One of the more complicated cases I had was like a

18   slip-and-fall one where I had to learn slip-and-fall law from

19   some other state.  I was, like, completely out of my league

20   learning about whether it's normal accumulation of snow versus

21   something else.  And all the state court guys were all over it,

22   and I was, like, this is new to me.

23        (Laughter.)

24        THE COURT:  All right.  So I just need to learn the

25   law on that one.

1          MR. DVORAK:  Judge, do you have an opinion on

2     separating out the damages the way that they have it, though?

3          THE COURT:  I normally don't do that, but it's got to

4     be separated out for the defendants, of course.  I normally

5     don't do it by claim.  I do it by what is the excessive -- like

6     so you'd have who committed excessive force and who committed

7     failure to intervene, and then it would be and what are the

8     damages for excessive -- no, what are the damages, period.

9     That would just be it.  And then it would be the city's claim.

10    Because we have to separate defendants, right?  But wouldn't

11    they all be --

12         MR. DVORAK:  They're all joint --

13         THE COURT:  They're all going to be joint and liable

14    under the -- is the city -- the city is not going -- well, the

15    city is going to indemnify.

16         MR. DVORAK:  Yeah, so I don't see --

17         MR. GREEN:  We're not party to those other counts.

18         MS. KOHLS:  Your Honor, if I may suggest?

19         THE COURT:  Well, that doesn't matter.

20         MS. KOHLS:  For the first two, the failure to

21    intervene and the excessive force, you could combine them in

22    the way that Mr. Dvorak is suggesting; but at this time, until

23    I guess we further brief the willful and wanton issue, and of

24    course subject to the defendant officers' position on that,

25    but until we parse out the issue on the negligence of

1    Ms. Morris, I think we would have to have it separate for that,

2    because if she is able to be --

3              THE COURT:  Right.

4              MS. KOHLS:  -- hooked in, then we need to have those

5    damages separate.

6              THE COURT:  Exactly.

7              MR. DVORAK:  I would agree with that, I suppose.  I

8    would agree with that.

9              THE COURT:  Right.

10             MR. DVORAK:  If there is apportionment, that should be

11   separated out.  Correct.

12             THE COURT:  But I'm disinclined to break apart the

13   types of damages for the -- because you're almost making more

14   of an injury.  Like you're almost severing out different

15   injuries, right?  For excessive force versus --

16             MR. GREEN:  Basically three injuries:  One was the

17   failure to provide medication, which is really just emotional

18   type damages; then there's the handcuffing; and then there's

19   the bump on the head.  The bump on the head is covered under

20   the Illinois law.  And we would need to have that separated for

21   the reasons --

22             THE COURT:  I don't dispute that.

23             MR. GREEN:  Now that the battery claim is out also,

24   maybe we could combine the medication and everything else under

25   the federal, like have one line for all three of those because

139

1    it really doesn't matter, and just have the separate one for
2    the bump on the head.
3                THE COURT:  That's what I'm thinking, yeah.
4                MR. GREEN:  That might make it easier.
5                THE COURT:  I don't know.
6                MS. KOHLS:  I don't know what your --
7                THE COURT:  I don't know.  I'll take a look at it.  I
8    haven't decided.
9                All right.  So are there some major disputes regarding
10   any witnesses other than the expert one that I've already
11   highlighted?  And any disputes regarding exhibits that I need
12   to address that will aid you in getting ready for trial?
13               MS. KOHLS:  The only other dispute I think is over
14   Sharon Macaluso, other than Dr. Sergio Rodriguez.
15               THE COURT:  What's the dispute regarding?
16               MR. COHEN:  Initially, she was not dis -- well, she's
17   never been disclosed as a -- on a 26(a) disclosure.  But as the
18   plaintiff correctly pointed out, she was mentioned in an
19   interrogatory answer and it, in effect, said she may testify.
20   So based on that, the officers withdraw that objection.
21               THE COURT:  Okay.
22               MR. COHEN:  I don't know about the city.
23               MR. GREEN:  Your Honor, may I go back, just to finish
24   up the jury instructions?
25               We had two that the city supplemented.  One is the

1    concurrent negligence other than defendants.  That's the sole

2    proximate cause one that's under the I.P.I.

3           And then there's the justified force under state law,

4    what the officers are -- by law, when you have --

5           THE COURT:  You're re-arguing something that I've

6    taken under advisement and I haven't ruled on, and that's what

7    I said when I flipped through them.

8           So we're on to witness issues.  And are there any

9    other witness issues?

10          MS. KOHLS:  Dr. Sergio Rodriguez I believe the

11   plaintiff is objecting to.

12          MR. DVORAK:  Oh.  So with Dr. Rodriguez, he was, you

13   know, disclosed as an expert.  He was originally disclosed --

14   we would contend he was disclosed as an ADA expert.  That

15   seemed to be what he was disclosed as.  And then once we

16   voluntarily dropped the ADA, there was an issue about whether

17   he would end up testifying or not.  I even discussed it with

18   counsel, Mr. Cohen, are you going to, you know, call him or

19   not, and he said he wasn't sure at that time --

20          MR. COHEN:  Well, it's really more the city's --

21          MR. DVORAK:  Oh, okay.

22          But, either way, the deadline was Friday, you know, to

23   include him on the witness list.  And when we didn't see him on

24   the witness list, we cancelled the deposition.  We had ordered

25   his deposition.  And then, you know, the following Monday we

1    cancelled it.  So now we would have to re-order the deposition,

2    and then we have some issues about whether or not, you know, he

3    has permissible testimony because he, to our -- in our opinion,

4    he does a lot of legal conclusions.  He says this was

5    reasonable, this was, you know -- and those are jury questions.

6           THE COURT:  Okay.

7           MR. DVORAK:  So I think at this point, I think had

8    he -- had they indeed wanted to definitively call him as an

9    expert, they should have listed him on the pretrial order.

10          THE COURT:  Okay.

11          MS. KOHLS:  And to -- regards to the fact that they

12   didn't order the transcript, we did order the transcript.  We

13   ordered the original, so now it would be easily available to

14   the plaintiff.

15          And with regard to the other issues, the legal

16   conclusions, obviously he wouldn't be able to make legal

17   conclusions, but he would be able to testify live, so we would

18   make sure to prep our client on not, you know, violating the

19   rules of evidence.

20          THE COURT:  So was he disclosed as a 702 witness?

21          MS. KOHLS:  He was disclosed under 26(a)(2) and with

22   an expert report and expert testimony.  I have the disclosure

23   here, if you would like to review it.

24          MR. DVORAK:  And we took his deposition.  I'm not

25   saying we weren't on notice that at one point he was going to

1    be called as an expert.  My issue was when the pretrial order
2    came out and he was off of the report, I naturally assumed he
3    would not be called --
4              THE COURT:  Oh.
5              MR. DVORAK:  We didn't do any kind of motion *in limine*
6    on that.  And I think it is subject to challenge because I
7    think --
8              THE COURT:  So what are you challenging about him?
9              MR. DVORAK:  He does legal conclusions.  And also,
10   too, I don't think he has an adequate foundation for some of
11   the opinions that he does talk about.  But, obviously, if your
12   Honor is considering allowing him to be supplemented, I would
13   like to do a motion *in limine* on him.
14             THE COURT:  "Supplemented" meaning added to the
15   witness list?
16             MR. DVORAK:  Yes, because right now he's not.  Well, I
17   mean --
18             THE COURT:  Okay.  So why did you not have him on
19   the -- and when was the final pretrial order filed?
20             MS. KOHLS:  It was filed last Friday.
21             THE COURT:  Okay.
22             MS. KOHLS:  And then we --
23             THE COURT:  And so did you forget about him or what?
24             MR. GREEN:  It was inadvertent --
25             MS. KOHLS:  It was an inadvertent mistake and a

1    miscommunication with teams when we were putting it together.

2         THE COURT:  And so you have deposed him.  He was

3    disclosed in this disclosure with his -- his opinion and his

4    report.

5         MS. KOHLS:  Yes.

6         THE COURT:  And so you've had a week without knowing

7    that you were going to use him.  So you didn't challenge him in

8    a pretrial motion.

9         MR. DVORAK:  Yeah, that's what I'm saying.

10         THE COURT:  Okay.  So you can challenge him in a

11   pretrial motion.

12         MR. DVORAK:  Okay.  All right.  Thank you.

13         THE COURT:  So do that by next Friday as well.  Okay?

14   I mean, that's fine.  But he can be called as a witness.

15         MS. KOHLS:  Thank you, your Honor.

16         THE COURT:  What else?  On witnesses.

17         Any areas of evidence that, like, clumps of evidence

18   that you think are going to be problematic that you need a

19   pretrial ruling on?

20         MR. DVORAK:  I can't think of any.

21         THE COURT:  Okay.  So I'll put together a docket entry

22   that includes all of the rulings from today and the deadlines

23   for your future filings so you'll know exactly what was done

24   today.

25         You should have your pretrial conference docket

1     rulings with you at trial so that you don't do one of those,

2     "Oh, Judge, you ruled this way or that way," and then I say,

3     "Will someone please tell me where the ruling is?"  Because I

4     am always the one that has to pull it up.  So bring it with you

5     to trial if you're going to challenge that somebody was

6     supposed to keep something out or allowed to bring something

7     in.

8           And then I'll expect all of those filings.  And then I

9     will give you rulings as they come forward.  Okay?

10          Any issues regarding anything else that comes up

11     afterward, just make a motion.  I'm here Monday through

12     Thursday on motion call.  I'm here all week on everything else,

13     okay?

14          MR. COHEN:  Your Honor, I'm sorry, I think there's

15     still the outstanding -- the thing we were in court for

16     yesterday, the city's motion to amend the complaint -- the

17     answer to the complaint.

18          THE COURT:  Oh, right.

19          MR. DVORAK:  No objection.

20          THE COURT:  Okay.  Very well.

21          MR. BLEIFUSS:  And, again, I apologize for being late

22     yesterday.

23          MS. KOHLS:  And then on Monday I had the motion up for

24     Dr. Rodriguez, so I guess we can probably strike the --

25          THE COURT:  Yes.  Right.  I think I -- yes, that's

1    right.  You don't have to come in on Monday for that.

2         MR. DVORAK:  He's allowed to be part of the pretrial

3    order.  The issue is now --

4         THE COURT:  Now you get to challenge him if you think

5    that he's -- well, certainly the legal conclusions worries me

6    the least because I would be able to object to that -- I mean,

7    you'd be able to object, and I would be able to rule and keep

8    it out.  But if you want to highlight what the legal

9    conclusions are, I can make that part of my ruling when I do

10   the *Daubert*.

11        As far as his credentials or his -- the basis of his

12   knowledge to conclude the way he did, that's what I'm looking

13   at under that *Daubert* function, okay?

14        MR. DVORAK:  Judge, by the way, I said I didn't care

15   one way or the other as far as the verdict form being by name

16   or by claim.

17        THE COURT:  Yes.

18        MR. DVORAK:  Actually, I think I agree.  We can use

19   the defendants' by claim form as kind of the standard to work

20   off of.

21        THE COURT:  I'll take a look.  I don't know.  I have

22   to decide myself.  I usually am working on the verdict form

23   throughout the trial to make sure that it's comporting with the

24   evidence and makes sense.  I read it a few times before we

25   actually finalize it.  So you'll also get a version of that

1    with the version of jury instructions that will be evolving

2    over time.  Okay?

3         All right.  Anything else from anyone before we break

4    for today?

5       (No affirmative response.)

6         THE COURT:  All right, great.  Enjoy.  I'm glad we

7    didn't get rained on.

8         ALL PRESENT:  Thank you, your Honor.

9         THE COURT:  Have a good weekend.

10      (Off-the-record discussion.)

11        THE COURT:  Are you going to have this electronically?

12        MR. COHEN:  I can give this -- this is all from

13   electronic files anyway.

14        THE COURT:  That's fine.  As long as you're using it

15   electronically, you know, I want -- because, remember, the way

16   that it works at the end of the trial is that you're required

17   to upload your exhibits to the system that's in my jury room.

18        MR. COHEN:  The JERS system.

19        THE COURT:  Yes, it's the JERS system.  And so you

20   have to have them ready on your flash drive to give to the

21   courtroom deputy, and then you sign a certification that you

22   all agree that those were the ones that were admitted at trial.

23        And that can't be a delay.  That has to be as soon as

24   closings are done or before the closings so that the jurors go

25   right back and get them.  Okay?

147

1          MS. KOHLS:  Okay.

2          MR. COHEN:  The instructions --

3          MS. KOHLS:  And here's another copy of the exhibits.

4          THE COURT:  Okay, great.  Thank you very much.

5          MS. KOHLS:  And then we'll get you one more.  You said

6   you wanted three, right?  One for you, one for your law clerk,

7   and one for Gayle.

8          THE COURT:  Okay, great.

9          MS. BAUER:  I can --

10          MR. DVORAK:  Was there a deadline on that, Judge?  We

11   have not gotten --

12          THE COURT:  No, the day of trial is fine.  Yes.  It's

13   just better that way.

14          MS. BAUER:  We just brought them.

15          THE COURT:  All right.  Thank you.  Have a great

16   weekend.

17      (Proceedings concluded at 1:39 p.m.)

18                    C E R T I F I C A T E

19      I certify that the foregoing is a correct transcript of the

20   record of proceedings in the above-entitled matter.

21

22

23   */s/ GAYLE A. McGUIGAN*                    *July 19, 2018*
     Gayle A. McGuigan, CSR, RMR, CRR                    Date
24   Official Court Reporter

25